LOGINTER S.A. Y PARQUE INDUS-
TRIAL AGUA PROFUNDA S.A.
UTE, et. al.,

v.

M/V NOBILITY, in rem.

No. CIV.A. WMN–00–3448.

United States District Court,
D. Maryland.

Sept. 10, 2001.

Andrew M. Winick, Wilson, Elser, Moskowitz, Edelman and Dicker, LLP, Baltimore, MD, James W. Bartlett, III, Semmes, Bowen and Semmes, PC, Baltimore, MD, for Loginster S.A. Y Parque Industrial Agua Profunda S.A. Ute.

David McI. Williams, Charles L. Simmons, Jr., Gorman & Williams, Baltimore, MD, for Canton Maritime Services, Inc.

Geoffrey S. Tobias, Ober, Kaler, Grimes and Shriver, Baltimore, MD, for Clipper Bulk Shipping, Ltd.

J. Stephen Simms, W. Charles Bailey, Jr., Greber & Simms, Baltimore, MD, Sarah Elizabeth Parshall, Owings Mills, MD, for intervenor-plaintiffs.

James D. Skeen, David W. Skeen, Wright, Constable and Skeen, LLP, Baltimore, MD, for Estonian Maritime Agency, Ltd.

## MEMORANDUM

NICKERSON, District Judge.

This admiralty action is before the Court on the parties' cross-motions and one party's unopposed motion for summary judgment. The motions are fully briefed and ripe for decision. Upon a review of the pleadings and the applicable case law, the Court determines that no hearing is necessary. Local Rule 105.6.

## I. BACKGROUND

The parties' motions, involving no fewer than eight entities from seven countries, present the Court with a virtual "world tour" through the waters-and laws-of many nations. Plaintiffs in this action claim that they have maritime liens against the *in rem* defendant, the M/V NOBILITY. The owner of the vessel is Fenice Marine Ltd. ("Fenice"), an entity organized under the laws of Malta. The claimant in this Court is the vessel's long term time charterer, Clipper Bulk Shipping, Ltd. ("Clipper Bulk"), of the Bahamas. The following facts are undisputed.

From October 13, 2000, through early December, 2000, the M/V NOBILITY was on charter from Clipper Bulk to Hawkspere Shipping Co., Ltd. ("Hawkspere"), of the Bahamas. Hawkspere acted through its agent in England, Serac.

Plaintiff Poseidon & Frachtcontor Junge, Ltd. ("Poseidon") served as the husbanding agent for the M/V NOBILITY during its call at the Port of Szczecin, Poland, on October 16 and 17, 2000. Poseidon provided and arranged for routine services (such as loading cargo and hiring tugs) for the vessel while in port. Poseidon billed Hawkspere, through its agent Serac, $21,589.57 for services rendered and advance payments made by Poseidon to

various vendors who tended to the ship.[1] Hawkspere has not paid Poseidon.

On October 24, 2000, the M/V NOBILITY received bunkers in the Port of St. Petersberg, Russia. The bunkers were delivered to the vessel by the Baltic Bunkering Company ("Baltic"), of Russia. Arrangements for the delivery of the bunkers were made by a broker for Hawkspere and Serac, J.B. Marine of England. Hawkspere, through J.B. Marine, then received an invoice from plaintiff Northwest Bunkering, Inc. ("Northwest"), of Liechtenstein, for the amount of $72,350.00 for the bunkers. Clipper Bulk and Northwest dispute whether Hawkspere's bunkering contract was with Baltic or Northwest, which will be addressed *infra*. There is no dispute, however, that the amount due has not been paid.

Plaintiff Canton Maritime Services, Inc. ("Canton"), a Maryland corporation, provided stevedoring and dockage services to the M/V NOBILITY in the Port of Baltimore from approximately November 9 through December 1, 2000. Canton billed Hawkspere and Serac for the amount of $76,290.14, which remains unpaid.

On November 22, 2000, the M/V NOBILITY was arrested in Baltimore by the initial plaintiff in this case, Loginter S.A. Y Parque Industrial Agua Profunda S.A. UTE ("Loginter") pursuant to Supplemental Rule C of the Federal Rules of Civil Procedure, authorizing the arrest of a vessel subject to an action *in rem*.[2] Plaintiffs Canton, Poseidon, and Northwest subsequently intervened in this action and now move for summary judgment against the M/V NOBILITY *in rem*.[3] Claimant Clipper Bulk cross-moves for summary judgment against Poseidon and Northwest; Canton's motion for summary judgment is unopposed.

## II. LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying the portions of the opposing party's case which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party is entitled to have "all reasonable inferences ... drawn in its respective favor." *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1129 (4th Cir. 1987).

If the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to summary judgment as a matter of law, the non-moving party must, in order to withstand the motion for summary judgment, produce sufficient evidence in the form of depositions, affidavits or other documentation which demonstrates that a triable issue of fact

1. Claimant Clipper Bulk questions whether Poseidon actually paid the vendors who provided services to the M/V NOBILITY. *See* Clipper Bulk's Cross–Mot. for Summ. J. against Poseidon at 3. Poseidon's managing director, however, testified in his affidavit that Poseidon has paid the vendors and appended several vendor invoices that do not contradict that position. *See* Poseidon's Mot. for Summ. J., Ex. A. Clipper Bulk has not presented any evidence to the contrary.

2. Loginter's claims have since been settled by the parties.

3. Plaintiff Canton has also brought *in personum* claims against Hawkspere and Serac, but those are not presently before the Court.

exists for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Unsupported speculation is insufficient to defeat a motion for summary judgment. *Felty,* 818 F.2d at 1128 (citing *Ash v. United Parcel Serv., Inc.,* 800 F.2d 409, 411–12 (4th Cir.1986)).

When both parties file motions for summary judgment, the court applies the same standards of review. *Taft Broadcasting Co. v. United States,* 929 F.2d 240, 248 (6th Cir.1991); *ITCO Corp. v. Michelin Tire Corp.,* 722 F.2d 42, 45 n. 3 (4th Cir.1983) ("The court is not permitted to resolve genuine issues of material facts on a motion for summary judgment—even where . . . both parties have filed cross motions for summary judgment") (emphasis omitted), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985). The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acc. and Indem. Co.,* 627 F.Supp. 170, 172 (D.Md.1985) (quoting Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil* 2d § 2720 (2d ed.1993)). *See also Federal Sav. and Loan Ins. Corp. v. Heidrick,* 774 F.Supp. 352, 356 (D.Md. 1991). "[C]ross-motions for summary judgment do not automatically empower the court to dispense with the determination whether questions of material fact exist." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt,* 700 F.2d 341, 349 (7th Cir.1983), *cert. denied,* 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987). Both motions may be denied. *See Shook*

*v. United States,* 713 F.2d 662, 665 (11th Cir.1983).

## III. DISCUSSION

### A. Canton

■ Canton contends that the debts owed to it by Hawkspere and Serac give rise to a maritime lien against the M/V NOBILITY under the Federal Maritime Lien Act (F.M.L.A.), 46 U.S.C. § 31342, which states:

> Establishing maritime liens
>
> (a) Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—
>
> (1) has a maritime lien on the vessel;
>
> (2) may bring a civil action in rem to enforce the lien; and
>
> (3) is not required to allege or prove in the action that credit was given to the vessel.
>
> (b) This section does not apply to a public vessel.

46 U.S.C. § 31342.

"Necessaries" are defined in the F.M.L.A. as including repairs, supplies, towage, and the use of a dry dock or marine railway. 46 U.S.C. § 31301(4). Courts have expanded on the meaning of necessaries by including "most goods or services that are useful to the vessel, keep her out of danger, and enable her to perform her particular function . . . ." *Foss Launch & Tug Co. v. Char Ching Shipping U.S.A., Ltd.,* 808 F.2d 697, 699 (9th Cir.1987) (quoting *Equilease Corp. v. M/V SAMPSON,* 793 F.2d 598, 603 (5th Cir. 1986) (*en banc*)). Stevedoring and dockage services such as those provided by Canton to the M/V NOBILITY have been deemed necessaries under § 31301(4). *See, e.g., Ameejee Valleejee & Sons v. M/V*

*VICTORIA,* 661 F.2d 310, 311, 1982 AMC 1557 (4th Cir.1981); *Ceres Marine Terminals Inc. v. M/V HARMEN OLDENDORFF,* 913 F.Supp. 919, 927 n. 12, 1995 AMC 2769 (D.Md.1995).

■ It is undisputed that the necessaries provided by Canton were ordered by Hawkspere, charterer of the vessel, through its agent Serac. Under the F.M.L.A., an agent appointed by a charterer of a vessel is presumed to have authority to procure necessaries. 46 U.S.C. § 31341. Clipper Bulk has not opposed Canton's motion for summary judgment, and thus the presumption has not been rebutted.

Based on the above, the Court finds that as a matter of law Canton has met the F.M.L.A. requirements for establishing a maritime lien.

### B. Northwest Bunkering

■ The parties' dispute over Northwest's claim is essentially about whose contract terms control the St. Petersburg bunker transaction. The Court finds, however, that determining the answer to that deceptively simple-sounding question does not resolve this case, as explained below. But in the interest of completeness, the Court will address the parties' arguments, only to conclude that when all is said and done, they are not dispositive of the matter at hand.

The parties agree that the M/V NOBILITY was provided with bunkers in port at St. Petersberg, Russia, on October 24, 2000. The parties further agree that the bunkering services were ordered by Serac, agent for charterer Hawkspere, acting through a broker in England, J.B. Marine. Also undisputed is the fact that neither Hawkspere nor Serac paid for the bunkers. Northwest and Clipper Bulk do contest, however, whether the contract for bunkers was with Baltic-the company that actually delivered the bunkers to the vessel, or Northwest-the company that billed Serac for the bunkers and now seeks a maritime lien.

Each party claims that a determination of the seller's identity will answer the question of which nation's law controls, and thus resolve whether or not Northwest may assert a maritime lien. Northwest claims that it was the contracting party to the sale, and that the question of a maritime lien therefore should be resolved according to its contract terms. Northwest argues that its contract calls for United States law to govern, or in the alternative that under choice of laws analysis the law of the ship's flag (Malta) should control.

In support of its claim that it was the bunker seller, Northwest submitted the affidavit of its managing director, Markus H. Hasler, who asserts that on the day before the bunker delivery, Northwest sent J.B. Marine written confirmation of the sale. *See* Northwest's Mot. for Summ. J., Ex. A. This confirmation, also provided to the Court, lists Northwest as the seller and Baltic as the supplier. *Id.* The day after the delivery, Northwest sent J.B. Marine an invoice for the bunkers. *Id.*

Claimant Clipper Bulk asserts that the contract was with Baltic. Accordingly, Clipper Bulk contends that the law of Russia or England should apply, under choice of laws analysis or the terms of Baltic's contract. Clipper Bulk concedes that J.B. Marine received the Northwest confirmation and invoice, *see* Clipper Bulk's Revised Reply Mem. in Supp. of Mot. for Summ. J. as to Northwest at 2,[4] but em-

---

4. Only a few pages later in its motion, *see id.* at 5, Clipper Bulk states that J.B. Marine did

"not" receive the pre-delivery confirmation, but the Court must assume this is a typo-

phasizes that Hawkspere and Serac were not made aware of Northwest's involvement until well after the bunker delivery. *See* Clipper Bulk's Revised Reply Mem. in Supp. of Mot. for Summ. J. (hereinafter, "Clipper Bulk Reply") at 5. Rather, Clipper Bulk asserts that all of J.B. Marine's pre-delivery negotiations were with Baltic, and several weeks after the delivery Baltic informed J.B. Marine that bunker delivery was governed by Baltic's "Fuelcon" contract. *See* Clipper Bulk Reply, Ex. D6, D8.

The Court need not decide whether the bunker contract was with Baltic or Northwest. Under either result, as explained below, this dispute is governed by Russian or English law, neither of which gives rise to a maritime lien for Northwest.

#### i. Northwest's Contract Terms

■ Northwest asserts that its contract terms with Hawkspere/Serac should govern this dispute, and that under those terms, U.S. law should control and Northwest should hold a maritime lien. Generally, choice of law provisions in maritime contracts are enforceable. *See, e.g., Lauritzen v. Larsen*, 345 U.S. 571, 588–89, 73 S.Ct. 921, 97 L.Ed. 1254 (1953); *Ryan–Walsh v. M/V OCEAN TRADER*, 930 F.Supp. 210, 218–19 (D.Md.1996); *Sembawang Shipyard, Ltd. v. Charger, Inc.*, 955 F.2d 983, 986 (5th Cir.1992). If Northwest's contract were to govern the bunker transaction, however, the very terms of the contract fail to apply United States law to the present dispute.

■ The contract, which was referenced in the confirmation to J.B. Marine, states in provision 10 that Northwest reserves "the right to safeguard himself by maritime lien or the like in the vessel to the extent that this is authorized in a jurisdiction where the vessel can be found." *See* Northwest's Mem. in Supp. of Mot. for Summ. J., Ex. A. The M/V NOBILITY was arrested ("found") in a United States port, and is being sued in a United States Court. Under United States law, a maritime lien for a foreign supplier in a foreign transaction involving a foreign ship is "authorized" if, under choice of law principles, the governing foreign law would also grant a maritime lien. *See, Ocean Ship Supply, Ltd., v. M/V LEAH*, 1982 A.M.C. 2740 (D.S.C.1981), *aff'd* 729 F.2d 971 (4th Cir. 1984); *Gulf Trading & Transportation Co. v. Vessel Hoegh Shield*, 658 F.2d 363, 367 (5th Cir.1981); 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 9–8 (3d ed.2001). Thus, this contract term merely directs the Court to a choice of laws analysis.

Northwest's attempt to provide explicitly for American law in its contract also fails. Contract provision 10, reserving Northwest a maritime lien right, states that, "the rule concerning venue and choice of law mentioned under point 15 shall be considered unwritten in relation to the rights conferred on the Seller according to the present point." *See* Northwest Mem. in Supp. of Mot. for Summ. J., Ex. A. Likewise, provision 15 states that, "[a]ll conflicts between the Buyer and the Seller shall be settled according to American (U.S.A.) law, and any lawsuits shall be settled at any maritime or commercial court of the U.S.A., *apart from what is mentioned under point 10.*" *Id.* (emphasis added). Therefore, even if it were the proper contracting party here, Northwest could not rely on the terms of its contract to apply United States maritime law to this action.[5] As a result, the Court must

---

graphical error, rather than a deliberate contradiction.

5. Additionally, Northwest's entire contract may be rendered inapplicable under its own

look to a non-contractual choice of laws analysis to determine what body of law would govern if Northwest were deemed the seller of the bunkers.

### ii. Choice of Laws Analysis

The Court of Appeals for the Fourth Circuit has used both the traditional *lex loci contractus* test and the more modern "factors" test to determine choice of laws when contract terms do not resolve the question. *Ocean Ship Supply, Ltd. v. M/V LEAH,* 729 F.2d at 973–74. Under the traditional test, it is clear that the bunkering contract was performed in Russia, where the bunkers were delivered to the ship. In is unclear, however, where the contract was made. An English broker (J.B. Marine), on behalf of English clients (Serac and Hawkspere) negotiated with a Russian supplier (Baltic) and received a confirmation and invoice from a Liechtenstein-based company (Northwest). Liechtenstein has no maritime law. Therefore, the *lex loci contractus* approach points either to Russian or English law.

The modern choice of law approach weighs several factors to determine which nation's law should control a maritime dispute. No court has determined a definitive list of factors for a maritime action based on contract. For actions involving a maritime tort claim, the United States Supreme Court has set forth the following seven factors that should be weighed in evaluating choice of laws: (1) place of the wrongful act; (2) law of the vessel's flag; (3) allegiance or domicile of the injured; (4) allegiance of the defendant shipowner; (5) place of contract; (6) inaccessibility of a

foreign forum; and (7) law of the forum. *Lauritzen* at 583–591, 73 S.Ct. 921.

In cases involving maritime liens rather than torts, courts look to the *Lauritzen* factors for guidance, but focus more attention on the citizenship of the parties, the location of the contract performance, and whether the ship is American. *See, e.g., Ocean Ship Supply v. Leah* (holding that where supplies were furnished to a foreign ship by a Canadian supplier in a Canadian port, Canadian law shall govern); *Gulf Trading & Transportation Co. v. The Vessel Hoegh Shield,* 658 F.2d at 368 (holding that where necessaries were furnished to a vessel in a port under U.S. jurisdiction by an American supplier, United States maritime lien statute would govern). In the instant case, a Russian supplier (Baltic) delivered bunkers to a Maltese ship in a Russian port. None of the entities involved are American. Under the modern test then, the strongest factors point to the law of Russia as controlling.

Plaintiff Northwest argues instead that a choice of laws analysis counsels for the application of Maltese law, particularly in light of the factors outlined in *Lauritzen.* The Court disagrees. In contrast to the instant case, *Lauritzen* involved a tort claim by a seaman arising out of an injury he received while on board. The law of the ship's flag was particularly relevant because of the principle that "there must be some law on shipboard, that it cannot change at every change of waters." *Lauritzen* at 585, 73 S.Ct. 921. Northwest's action for a maritime lien based on an unpaid bunker contract between entities of various nations does not implicate such a

---

first provision, which states that the contract is binding only if Northwest "can substantiate that one copy of said Conditions has been forwarded to the joint contractor." *Id.* Although Northwest asserts that J.B. Marine

had done business with them in the past and was familiar with their contract terms, Northwest has not substantiated that J.B. Marine ever received a copy of this contract.

need for a body of law to govern shipboard behavior.

Northwest also argues for the application of Maltese law based on the "allegiance of the defendant shipowner" factor set forth in *Lauritzen*. This too misapplies the law. First, the owner of the M/V NOBILITY is not a defendant to Northwest's *in rem* action against the vessel. Second, the *Lauritzen* Court included this factor in their analysis because "in recent years a practice has grown, particularly among American shipowners, to avoid stringent shipping laws by seeking foreign registration eagerly offered by some countries." *Lauritzen* at 587, 73 S.Ct. 921. In the case at bar, however, the owner's allegiance and the ship's flag are both Maltese.

In summary, a non-contractual choice of laws analysis is appropriate here because Northwest's contract terms fail to establish United States law as controlling. The traditional *lex loci contractus* test and the modern factors test point to either the law of Russia or the law of England as governing Northwest's claim.

### iii. Baltic's Contract Terms

Clipper Bulk argues that if Baltic's contract governed the transaction, English law would apply. The Court agrees. Several weeks after the delivery, Baltic informed J.B. Marine that its bunker transactions are governed by the "Standard Marine Fuels Purchasing Contract," also known as "Fuelcon." *See* Clipper Bulk Reply, Ex. D6, D8. Under the terms and conditions of the Fuelcon contract, the default choice of law provision indicates that

the contract shall be governed according to English law.[6] Neither Northwest nor Clipper Bulk has presented evidence that anything other than the default provision was chosen. Therefore, if Baltic's contract were to govern the transaction, the law of England would apply.

### iv. English Law

It is well recognized that English law does not grant a maritime lien to a supplier of necessaries, including bunkers, to a vessel. See, e.g., W. Tetley, *Maritime Liens and Claims*, 2d Ed. (1998); *Trinidad Foundry and Fabricating Ltd. v. M/V KAS CAMILLA*, 966 F.2d 613 (11th Cir. 1992); *First Marine Distributors, Inc. v. M/V MARYLOU II*, 1997 A.M.C. 22 (D.Md.1996). Although plaintiff Northwest disputes the applicability of English law, it does not contest that law's failure to provide a maritime lien in this circumstance.

### v. Russian Law

■ Supplemental Rule C of the Federal Rules of Civil Procedure limits the availability of an *in rem* action "to enforce any maritime lien." *Id.* When foreign laws determine the parties' rights, nothing less than a maritime lien under the applicable foreign law will sustain an *in rem* action in a court of the United States. *Newport News Shipbuilding and Dry Dock Co. v. S.S. Independence*, 872 F.Supp. 262, 265 (E.D.Va.1994); Schoenbaum, *supra*. A right of arrest under foreign law is not sufficient. *Lion de Mer S.A. v. M/V LORETTA D*, 1998 A.M.C. 1410, 1413 (D.Md. 1998) (noting that "[t]he inquiry here, how-

---

**6.** The "Fuelcon" contract includes a standard form, which parties may modify by entering their terms in blank blocks. Clipper Bulk asserts-and Northwest does not dispute-that Block 17, "Law and Arbitration," of the Fuelcon contract from Baltic (submitted to the

Court by Clipper Bulk) was left blank. Part II of the Fuelcon contract indicates that if the parties leave Block 17 blank, they are to apply provision 16(a), which states that the law of England shall govern the contract.

ever, is not whether the vessel might be arrested under [Russian] law, but whether [Russian] law gives rise to a maritime lien based on a claim for [bunkers]." In this case, Clipper Bulk asserts that Russian law provides only a right of arrest for a party in Northwest's position. Northwest claims that Russian law, if it were to govern this case, would give rise to a maritime lien.

Northwest bears the burden of establishing its entitlement to a maritime lien under Russian law. *Newport News* at 265. The Court finds that it has not done so. The Court may consult any relevant material or source to determine the substance of foreign law. Fed.R.Civ.P. 44.1. Clipper Bulk has submitted the affidavit of V.A. Sergeev, a Russian lawyer with forty years of experience in commercial and shipping law. Mr. Sergeev explains that the Russian Merchant Shipping Code does not recognize a maritime lien for unpaid suppliers of bunkers. Rather, the Code lists only a few claims that receive special maritime lien status.[7] The list does not include fuel oil or bunkers. Mr. Sergeev also cites the Merchant Shipping Code of the Russian Federation, Articles 388–390, which permit the arrest of a vessel for the purpose of obtaining security for unpaid necessaries, including fuel. Mr. Sergeev contends, however, that such provisions apply only to a vessel arrested under Russian jurisdiction. Sergeev Aff. ¶ 4.

In its response, Northwest footnotes its disagreement with Mr. Sergeev, but does not support its argument with an affidavit. *See* Northwest's Resp. to Claimant's Mot. for Summ. J. at 7. Northwest argues that the right of arrest accorded by the Feder-

ation code is actually "an *in rem* claim on a maritime lien, under U.S. law." *See* Northwest Mem. in Supp. of Mot. for Summ. J. at 7. Northwest cites no law or other basis for this assertion. Without more, the Court finds that Northwest has not met its burden of showing entitlement to a maritime lien under Russian law.

In summary, Northwest's claim arising out of the unpaid bunkers delivered to the M/V NOBILITY is governed by either English law, as directed by either the Baltic contract or choice of laws analysis, or Russian law, as the more likely outcome of a choice of laws analysis. Neither source of law provides Northwest with a maritime lien against the vessel. Therefore, the Court finds that Northwest is not entitled to a maritime lien.

### C. *Poseidon*

■ The facts underlying Poseidon's claim are undisputed. Clipper Bulk and Poseidon also agree that the law of Poland governs this controversy, in which a Polish company provided services to a Maltese ship in a Polish port. The disagreement between the parties is whether Polish law grants a maritime lien to a party in Poseidon's position. It is Poseidon's burden to establish a right to a maritime lien in this *in rem* action. *Newport News* at 265.

Affidavits submitted by the parties indicate two principal areas of disagreement: (1) whether Poseidon has complied with the requirements of the Polish Civil Procedure Code for arresting a vessel; and (2) whether the Polish Maritime Code gives Poseidon a maritime lien against the M/V NOBILITY.[8]

---

**7.** These claims include: "claims involving wages and other sums due to the master or crew, compensation for damages caused to life and health, remuneration for salvage, payment of port and channel dues, and compen-

sation for actual damage to property other than cargoes, containers, and passengers' belongings carried on board." Sergeev Aff. ¶ 3.

**8.** The parties agree that the provisions of the 1952 Brussels Arrest Convention do not ap-

The Court need not assess the parties' arguments as to the application of the Polish Civil Procedure Code. Maritime liens are "an integral aspect of substantive, rather than procedural maritime law." *Amstar Corp. v. S/S Alexandros T.,* 664 F.2d 904, 908 (4th Cir.1981). Choice of law principles "require a court to apply the substantive law of a foreign forum where that foreign jurisdiction has the greatest interests in the litigation." *Garcia v. M/V KUBBAR,* 4 F.Supp.2d 99, 103 (N.D.N.Y. 1998), *citing Carbotrade S.P.A. v. Bureau Veritas,* 99 F.3d 86, 89 (2d Cir.1996), *cert. denied, Veritas v. Carbotrade S.p.A.,* 520 U.S. 1274, 117 S.Ct. 2454, 138 L.Ed.2d 212 (1997). Under traditional choice of law principles, however, the law of the forum State governs on matters of procedure. *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 778 n. 10, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), *citing The Restatement (Second) of Conflict of Laws* § 122 (1971). The M/V NOBILITY was arrested in the United States according to United States procedural law. Whether or not Poseidon complied with arrest provisions in the Polish Civil Procedure Code is irrelevant to the inquiry at hand.

The parties' dispute over Polish substantive law centers on the meaning of Polish Maritime Code, Article 68, Item 5, which reads (in the official English translation):

The following claims are privileged:

" ... (5) [claims arising out of] contracts entered into or other legal acts done, by the master [acting] within the scope of his statutory authority while the vessel is away from her home port, [where such contracts or acts are] actually necessary for the preservation of the vessel or the continuation of [her] voyage, whether the master is [or is not]

ply, because the M/V NOBILITY is registered in Malta, which is not a participant in the

at the same time operator or owner of the vessel, and whether the claim is his own or (that) of shiphandlers, persons repairing the vessel, lenders, or other contracting parties."

*Id.* While the parties agree that a "privileged claim" under this provision constitutes a maritime lien, they urge different interpretations of the statute.

Clipper Bulk argues that the provision is intended to apply "only under the circumstance where the current employer of the vessel doesn't show any interest in the whereabouts of the vessel and therefore the Master is forced to directly and personally undertake exceptional steps to safeguard the vessel, the cargo and the crew." *See* Clipper Bulk's Cross–Mot. for Summ. J. against Poseidon, Ex. B, ¶ 12. Clipper Bulk's affiant, a Polish maritime lawyer, cites no basis or support for this assertion, which would exert a significant limitation on the plain meaning of the statute.

Clipper Bulk contends that the services provided and arranged by Poseidon for the M/V NOBILITY did not constitute the "exceptional steps" allegedly called for by the statute. *Id.* The invoices and reports submitted to the Court by Poseidon indicate otherwise. Poseidon provided and secured services such as: supervision, equipment, and labor for the loading of cargo; garbage removal; emergency tug boat services in port; tonnage fees; inspection of ship's bunkers, technology, and overall condition; and assistance in arriving and departing the port. *See* Poseidon Mot. for Summ. J., Ex. A. Under the statute's plain meaning, these basic duties of a husbanding or port agent appear on their face to be necessary for the vessel's preservation

convention.

and voyage. Additionally, as noted by Poseidon's affiant, some of these services would also constitute privileged claims under Polish Maritime Code Article 68, Item 1, which covers "tonnage dues;...pilotage dues and costs of watching and of the preservation of the vessel, arising from the time of her entry into the last port." *Id.*

Clipper Bulk also argues that Poseidon is not entitled to a privileged claim under Article 68, Item 5, because Poseidon's services were ordered by the charterer, Serac, not the ship's master. Poseidon agrees that the services were requested by Serac, and provides ample documentation of the many email, telex, and facsimile communications between Poseidon and Serac before and during the two days the ship was in port. *See* Poseidon Mot. for Summ. J., Ex. A. As pointed out in Poseidon's affidavit on Polish law, the Polish Maritime Code was enacted in 1961, prior to modern advances in communication technology that allow distant parties instantly to communicate complex written instructions and modifications. Earlier, the master of the ship had personified the ship's owners and charterers, and acted as the only physical presence who could quickly communicate about services for the ship. The Court finds this historical context a persuasive reason not to limit the claim to contracts entered into by the master himself, particularly in light of the widespread modern practice of distant charterers directly ordering services for their ships. Otherwise, none of those service providers could avail themselves of the protection offered by the statute-a result that seems incongruous with the law's purpose.

Therefore, the Court finds that Poseidon has met its burden of showing entitlement to a maritime lien under Polish substantive law.

## IV. CONCLUSION

For the reasons stated, the Court finds that as a matter of law, plaintiffs Canton and Poseidon have established that they are entitled to maritime liens as required for their *in rem* actions under Supplemental Rule C of the Federal Rules of Civil Procedure. Consequently, by a separate order, this Court will GRANT plaintiff Canton's and plaintiff Poseidon's motions for summary judgment *in rem,* and DENY claimant Clipper Bulk's motion for summary judgment against Poseidon. The Court will GRANT claimant Clipper Bulk's motion for summary judgment as to Northwest, and DENY Northwest's motion for summary judgment *in rem.*

Prevailing plaintiffs Canton and Poseidon have asked this Court to award prejudgment interest at a three-month average Treasury bill rate of 5.74%. The award of prejudgment interest in maritime cases is "almost automatic unless the manner in which the claim has been prosecuted is properly subject to criticism." *W.R. Grace & Co. v. S.C. Loveland Co.,* 1990 A.M.C. 2515, 2520, 1990 WL 13014 (4th Cir.1990) Prejudgment interest may be denied in a case only under "exceptional circumstances." *Ingersoll Milling v. Bodena,* 1988 A.M.C. 223, 250, 829 F.2d 293 (2d Cir.1987). The Court finds that no such exceptional circumstances are presented here, and prejudgment interest will be awarded to Plaintiffs Canton and Poseidon.

The rate of interest used is within the Court's sound discretion. *Ingersoll* at 250. The Second Circuit has suggested as a benchmark "short-term, risk free obligation[s]." *Id.* This Court has followed suit. *See, e.g. Bruzzone Consolidation, Inc. v. M/V BLUE EAGLE,* 713 F.Supp. 146, 153 (D.Md.1989) (using average yield of three-month Treasury bills as the rate for prejudgment interest award). Accord-

ingly, interest will be allowed to Plaintiffs Canton and Poseidon at the requested rate of 5.74%. For each plaintiff, interest shall be calculated from the date on which payment was due.

### ORDER

Pursuant to the foregoing memorandum, and for the reasons stated therein, IT IS this      day of September 2001, by the United States District Court for the District of Maryland, hereby ORDERED:

1. That Plaintiff Canton's Motion for Summary Judgment *in rem* (Paper No. 43) is hereby GRANTED;

2. That Plaintiff Poseidon's Motion for Summary Judgment *in rem* (Paper No. 48) is hereby GRANTED;

3. That Claimant Clipper Bulk's Motion for Summary Judgment against Poseidon (Paper No. 49) is hereby DENIED;

4. That Plaintiff Northwest's Motion for Summary Judgment *in rem* (Paper No. 52) is hereby DENIED;

5. That Claimant Clipper Bulk's Motion for Summary Judgment against Northwest (Paper No. 47) is hereby GRANTED;

6. That Plaintiffs Canton and Poseidon shall submit to this Court a proposed order showing the amount of prejudgment interest due to them, calculated according to the foregoing memorandum, and provide copies to counsel for the other parties.