**TRANS–TEC ASIA, Plaintiff,**

**v.**

**M/V HARMONY CONTAINER Its freights, engines, apparel, and tackle, Defendant in rem,**

**Splendid Shipping Sendirian Berhard, Defendant, and**

**The Master of the M/V Harmony Container, Garnishee.**

**No. CV 04–1160 SVW (MANx).**

United States District Court, C.D. California.

Aug. 17, 2005.

Gary R. Clouse, Isaacs Clouse & Crose, Santa Monica, CA, J. Stephen Simms, Simms Showers, Baltimore, MD, for Plaintiff.

Bradley M. Rose, Kaye Rose & Partners, Los Angeles, CA, for Defendants.

ORDER GRANTING THE MOTION FOR PARTIAL SUMMARY JUDGMENT BY DEFENDANT M/V HARMONY CONTAINER IN REM AND CLAIMANT SPLENDID SHIPPING SDN BHD AND DENYING TRANS–TEC'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT ON CHOICE OF LAW

WILSON, District Judge.

## I. INTRODUCTION

This admiralty case arises out of a dispute over unpaid bunkers (fuel). Plaintiff Trans–Tec Asia ("Trans–Tec") sold bunkers to the charterer of Defendant *in rem* M/V Harmony Container ("Vessel"), the Kien Hung Shipping Company Ltd. ("Kien Hung"). Kien Hung later went bankrupt. Its bunkers still unpaid, Trans–Tec filed this action against the Vessel and its Owner, Defendant Splendid Shipping Sendirian Berhard ("Splendid") (collectively "Defendants").

Trans–Tec asserts five causes of action: (1) maritime lien claims in contract against the Vessel and freights; (2) maritime lien claims in tort against the Vessel and freights; (3) maritime claims in contract against the owner; (4) unjust enrichment claims against the owner; and (5) maritime attachment and garnishment of the Vessel and bunkers of the Vessel.[1]

Because choice of law is a threshold issue in this case, the Court encouraged the parties to file motions for partial summary judgment on the issue of choice of law. They have now done so. For the reasons set forth below, the Court GRANTS the Motion for Partial Summary Judgment by Defendant M/V Harmony Container *in rem* and Claimant Splendid Shipping SDN BHD.

## II. FACTS[2]

This case involves six major players or entities: (1) Trans Tec, (2) the Vessel, (3) Splendid, (4) Kien Hung, (5) Halim Mazmin Berhad ("Halim Mazmin"), and (6) Powick Marine (Singapore) Pte. Ltd. ("Powick").

---

1. Trans–Tec has decided not to pursue its tort claim (conversion) and will dismiss it.

2. Trans–Tec does not object to any of Defendants' factual assertions on evidentiary grounds. Nor does Trans–Tec controvert any of Defendants' factual assertions with contrary evidence of its own. Rather, Trans–Tec responds by (1) claiming that it is unable to dispute Defendants' factual assertions due to a need to conduct further discovery and/or (2) admitting the truth of Defendants' factual assertions while denying their relevance. Since the Court previously denied Trans–Tec's Rule 56(f) motion, the Court must now treat as uncontroverted those factual assertions which Trans–Tec is unable to dispute. Moreover, while Trans–Tec has submitted its own State-

The Vessel is registered (or "flagged") under the laws of Malaysia. Splendid was at all relevant times the registered owner of the Vessel.

Splendid is a Malaysian private company with its principal place of business in Malaysia. At all relevant times, Halim Mazmin, a Malaysian public company, owned 60% of Splendid, and Powick, a Singapore corporation, owned 40%.

At all relevant times, Splendid had a board of five (5) directors operating by simple majority vote. The five directors were: Captain Suresh Abishegam, Tan Sri Dato' Halim Bin Mohammad, Abd Halim Bin ˚A Rahim, Shih Shia Loon and Shih Ming Tuan.[3]

Trans–Tec is registered as a Singapore "sole proprietorship" with its principal place of business in Singapore.[4] World Fuel Services (Singapore) Pte. Ltd., a Singapore limited private company, owns Trans–Tec. World Fuel Singapore Holding Company II Pte. Ltd. is the sole shareholder of World Fuel Services (Singapore) Pte. Ltd.[5] It is not clear what entity owns World Fuel Singapore Holding Company II Pte. Ltd.[6]

Powick has been in existence since 1994 and has paid up share capital of Singapore $49,817.842. Upon its incorporation and at all relevant times, Powick's shareholders were: Shih Wen Kuo, Shih Shia Loon, Shih Shia Shung, Shih Shia Hsiang, and Shih Ming Tuan. Its directors were: Shin Wen Kuo, Shih Ming Tuan, Shih Shia Loon, Tan Chak Chew, and Ng Ee Choo Linda.

Kien Hung is a Taiwan corporation with its principal place of business in Taiwan. Kien Hung has 334 registered shareholders. Five of those shareholders are Shih family members: Shih Wen Kuo, Shih Shia

---

ment of Uncontroverted Facts, almost all of its factual allegations are impermissible legal conclusions and/or without evidentiary support. Indeed, paragraphs 2, 3, 5, 6, 7, 8, 9, 10, 11, and 12 of Trans–Tec's Statement of Uncontroverted Facts contain no citations to the record whatsoever. " '[J]udges need not paw over the files without assistance of the parties.' The efficient management of judicial business mandates that parties submit evidence responsibly." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 775 (9th Cir.2002) (quoting *Huey v. UPS, Inc.*, 165 F.3d 1084, 1085 (7th Cir.1999)).

3. Defendants claim that Halim Mazmin appointed three of the directors, including the Managing Director, while Powick appointed two. However, the evidence which Defendants cite for this proposition says nothing about how many directors were appointed by each shareholder or which director was appointed by which shareholder.

4. Trans–Tec contends that it should be treated as a United States corporation since it is ultimately owned by World Fuel Services ("WFS"), a Miami-based company. In its complaint, however, Trans–Tec, identified itself in its Complaint as "a division of a corporation organized and existing by virtue of and under the laws of Singapore. . . ." (Complaint ¶ 4.) This is a binding judicial admission. *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir.1988) ("Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them.").

5. Defendants identify World Fuel Singapore Holding Company I Pte. Ltd. as World Fuel Services (Singapore) Pte. Ltd.'s sole shareholder. However, the certified records from the Accounting and Corporate Regulatory Authority ("ACRA") identify World Fuel Singapore Holding Company II Pte. Ltd. as the sole shareholder. (Benny Decl. ¶ 5, Ex. B.)

6. Defendants submit evidence that the sole shareholder of World Fuel Singapore Holding Company I Pte. Ltd. is World Fuel Cayman Holding Company. However, according to the ACRA records submitted by Defendants, the owner of World Fuel Services (Singapore) Pte. Ltd. is World Fuel Singapore Holding Company II Pte. Ltd., *not* World Fuel Singapore Holding Company I Pte. Ltd. (Benny Decl. ¶ 5, Ex. B.)

Loon, Shih Shia Shung, Shih Shia Hsiang, and Shih Ming Tuan. Collectively, the Shih family members hold 63.4% of Kien Hung's stock. The balance is held by the remaining 329 shareholders. From June 2002 to the present, Kien Hung's directors were Shih Wen Kuo, Shih Shia Loon and Chen Yin. There is no evidence that Kien Hung has ever owned stock in either Splendid or Powick.

In July 2000, Splendid entered into a New York Produce Exchange charter party contract with Kien Hung for a 10 year charter of the Vessel (the "Charter Party"). Among other things, the Charter Party provided that (1) the Charterers were to "provide and pay for all the fuel except as otherwise agreed" and (2) the Charterers "would not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners of the vessel." (Abishegam Decl. ¶ 7, Ex. G, ¶¶ 2, 18.) The Charter Party further provided that "the Charter Party shall be governed by and construed in accordance with English law and any dispute arising out of this Charter Party shall be referred to arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment therefor for the time being in force." (Abishegam Decl. ¶ 11, Ex. G, ¶ 53.)

In or about July 2002, Powick provided a continuing written guarantee (the "Guarantee") to Trans–Tec, for and on behalf of Kien Hung, in consideration for Trans–Tec agreeing to supply bunkers to Kien Hung or vessels under charter to Kien Hung. The Guarantee was limited to U.S. $5 million and governed by Singapore law. The parties to the Guarantee agreed to submit to the jurisdiction of the Singapore courts for enforcement of the Guarantee.

On February 17, 2003, C.L. Wu ("Wu"), a manager for Kien Hung in its Taiwan office, faxed a bunker inquiry ("Bunker Inquiry") to Vivian Huang ("Huang") of Yee Foo Marine Industrial Co. Ltd. ("Yee Foo"), Trans–Tec's representative in Taiwan throughout 2002 and 2003.[7] Huang was Kien Hung's account representative at the time. The Bunker Inquiry requested a quote for bunkers to be provided to the Vessel for bunkering at Busan, South Korea on February 24, 2003. Huang faxed the Bunker Inquiry to Margaret Quek ("Quek") of Trans–Tec's Singapore office. Quek provided Huang with a bunker quote. Huang communicated the quote to Wu. In response, Wu faxed Huang a bunker order ("Bunker Order"). The Bunker Order stated: "Many thanks for your quotation on Feb/17/2003. Please arrange the follows [sic] and confirm by return." (Huang Decl. ¶ 7, Ex. C.) Huang then faxed the Bunker Order to Quek. Quek sent an email to Huang confirming the sale of 1150 metric tons of Grade 380CST RMG35 bunker fuel for the Vessel ("Bunker Confirmation"). Huang then faxed the Bunker Confirmation to Wu.

The Bunker Confirmation provided:

This confirmation incorporates seller's standard terms and conditions dated January 3, 2000. Pls inform us if you require a copy.

All sales are on the credit of the vessel. Buyer is presumed to have authority to bind the vessel with a maritime lien. Disclaimer stamps placed by the vessel on the bunker receipt will have no effect and do not waive the seller's lien.

---

7. Defendants characterize Yee Foo as Kien Hung's representative. However, Huang states in her declaration that Yee Foo is Trans–Tec's representative in Taiwan. (Huang Decl. ¶ 3.)

Pls advise this office immediately of any errors, omissions or changes involving any of the items above.

(Ashby Decl. ¶ 4, Ex. B.)

Trans–Tec's standard terms and conditions are allegedly set forth in a document entitled "The Trans–Tec Services Group of Companies General Terms and Conditions" ("Terms and Conditions"). The Terms and Conditions state:

> Effective January 3, 2000, the following terms of sale and supply shall constitute the General Terms and Conditions ("General Terms") of the Trans–Tec Service Group of companies, headquartered at 700 S. Royal Poinciana Blvd., Miami Springs, Florida 33166 including but not limited to Trans–Tec Services, Inc.; Trans–Tec Services (UK) Ltd.; Trans–Tec International S.A.; Casa Petro S.A. and Trans–Tec Asia, a division of World Fuel Services (Singapore) Pte. Ltd. Unless otherwise agreed, the General Terms shall apply to every sale of marine petroleum products ("Products") entered into between a particular Trans–Tec Group company as seller ("Seller"), and any buyer of such Products ("Buyer").

(Ashby Decl. ¶ 6, Ex. C.) The Terms and Conditions contain a Choice of Law Clause, a Payment Clause, a Credit and Security Clause, and a Merger and Integration Clause. The Choice of Law Clause provides:

> 17. Law and Jurisdiction: Seller shall be entitled to assert its lien or attachment in any country where it finds the vessel. Each Transaction shall be governed by the laws of the United States and the State of Florida, without reference to any conflict of laws rules. The laws of the United States shall apply with respect to the existence of a maritime lien, regardless of the country in which the Seller takes legal action.

(Ashby Decl. ¶ 6, Ex. C, ¶ 17.) The Payment Clause provides:

> 7. Payment: ... (b) Any individual bunker transaction not requiring cash advance shall require credit approval by Seller's Credit Department in Miami, Florida. This approval, which will occur prior to Seller's transmittal to Buyer of a confirmation, shall be construed as the binding act in a bunker transaction and it is agreed that contract formation has occurred in Florida and that bunkers have been provided in Florida within the scope of 42 USC 31326 . . . .

(Ashby Decl. ¶ 6, Ex. C, ¶ 7.) The Credit and Security Clause provides:

> 8. Credit and Security: (a) Products supplied in each Transaction are sold and effect on the credit of the receiving vessel, as well as on the promise of the Buyer to pay thereof, and it is agreed and the Buyer warrants that the Seller will have and may assert a maritime lien against the Receiving Vessel for the amount due for the Products delivered. This maritime lien shall extend to the vessel's freight payments for that particular voyage during which the bunkers were supplied and to freights on all subsequent voyages.

(Ashby Decl. ¶ 8, Ex. C, ¶ 8.) The Merger and Integration Clause provides:

> 1. Incorporation and Merger: Each sale of Products shall be confirmed by telex, fax, or other writing from the Seller to the Buyer ("Confirmation"). The Confirmation shall incorporate the General Terms by reference so that the General Terms thereby supplement and are made part of the particular terms set forth in the Confirmation. The Confirmation and the General Terms shall together constitute a separate transaction ("Transaction"). These documents, taken together, shall constitute the full agreement. No other prior agreements or understandings, whether verbal or

written, shall apply unless specifically referenced in the Confirmation. In the event of an inconsistency between the particular terms of the Confirmation and the General Terms, the Confirmation shall control for the purpose of that particular Transaction with the exception of Sections 8 and 17 below, which can only be modified by a mutually signed writing between Buyer and Seller.

(Ashby Decl. ¶ 6, Ex. C., ¶ 1.)

On February 28, 2003, Trans–Tec sent an invoice (the "Invoice") addressed to the "M/V Harmony Container and/or her owners/operators and Kien Hung Shipping Co. Ltd. c/o Yee Foo Marine Ind. Co. Ltd." on Trans–Tec's Singapore office letterhead that requested payment by April 10, 2003 and directed all "billing queries" to Trans–Tec's registered office in Singapore.[8] (Ashby Decl. ¶ 7, Ex. D.)

Kien Hung subsequently went bankrupt, and Trans–Tec was never paid.

Splendid contends that Trans–Tec did not negotiate the bunker supply transaction of February 17, 2003 with Splendid or the Master of the Vessel.[9] Splendid further claims that Trans–Tec did not advise, discuss, communicate or inform Splendid of the Bunker Confirmation.[10] Finally, Splendid claims that it had no knowledge of the Terms and Conditions or that Kien Hung allegedly agreed to the Terms and Conditions.[11]

## III. DISCUSSION

### A. Summary Judgment

Rule 56(c) requires summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); *Tarin v. County of Los Angeles*, 123 F.3d 1259, 1263 (9th Cir.1997).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). That burden may be met by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial. See *id.* at 323–34, 106 S.Ct. 2548; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir.2000).

Only genuine disputes—where the evidence is such that a reasonable jury could return a verdict for the nonmoving party—over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505.

### B. Choice of Law

A threshold issue in this case is which country's law governs the bunker agree-

**8.** The Invoice also identified Trans–Tec as a "division/branch of World Fuel Services (Singapore) Pte. Ltd." (Ashby Decl. ¶ 7, Ex. D.)

**9.** Trans–Tec provides no evidence to rebut this claim.

**10.** Trans–Tec disputes this claim on the basis that its communications with Kien Hung and Powick should be imputed to Splendid.

**11.** Trans–Tec provides no evidence to rebut this claim.

ment between Trans–Tec and Kien Hung for the bunkers supplied to the Vessel in Busan, South Korea in February 2003. Ordinarily, a federal court sitting in admiralty will enforce a valid choice-of-law clause. *Chan v. Soc'y Expeditions, Inc.,* 123 F.3d 1287, 1297 (9th Cir.1997). However, if there is no choice-of-law clause or the choice-of-law clause is invalid or unenforceable, the court will apply general maritime choice-of-law principles to determine which law applies. *Id.*

Trans–Tec contends that, based on the Choice of Law Clause, United States law applies. Splendid contends that, based on general maritime choice-of-law principles, Malaysian law applies. According to Trans–Tec, United States law applies because the Bunker Confirmation incorporated the Terms and Conditions, which in turn contained the Choice of Law Clause. Splendid argues in response that it is not bound by the Choice of Law Clause because (1) the Choice of Law Clause did not become a valid part of the bunker contract and (2) Splendid, as a non-party, is not bound by the bunker contract in any event. Accordingly, Splendid argues that the Court must apply general maritime choice-of-law principles and that these principles favor the application of Malaysian law.

*1. Contractual choice of law clause*

Trans–Tec contends that the bunker contract contained a valid choice-of-law

clause. Splendid does not dispute that a valid bunker contract was formed. It simply maintains that (1) the Choice of Law Clause did not become part of the bunker contract and, even if it did, (2) Splendid was not a party to the bunker contract and is therefore not bound by it.

■ "[W]here the parties specify in their contractual agreement which law will apply, admiralty courts will generally give effect to that choice." *Chan,* 123 F.3d at 1297. However, courts will decline to enforce a choice-of-law or forum-selection provision if the provision is "fundamentally unfair, or otherwise opprobrious." *Ryan–Walsh, Inc. v. M/V Ocean Trader,* 930 F.Supp. 210, 219 (D.Md.1996); *cf. The Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 12, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) (enforcing a forum selection clause "absent some compelling and countervailing reason").[12] In order to show that the bunker contract contained a valid choice-of-law clause binding on Splendid, Trans–Tec must show that (1) the Choice of Law Clause was valid and (2) Splendid was bound by the bunker contract.

*a. Did the contract contain a valid choice of law clause?*

■ United States law determines the validity of choice-of-law clauses. *See, e.g., Batchelder v. Kawamoto,* 147 F.3d 915, 918 (9th Cir.1998); *Richards v. Lloyd's of London,* 135 F.3d 1289, 1293 (9th Cir.1998).[13]

**12.** The Ninth Circuit has identified three situations in which a choice-of-clause or forum-selection clause may be repudiated: (1) if the inclusion of the clause was the result of fraud or overreaching; (2) if the party wishing to repudiate the clause would effectively be deprived of his day in court were the clause enforced; and (3) if enforcement would contravene a strong public policy of the forum in which the suit is brought. *Richards v. Lloyd's of London,* 135 F.3d 1289, 1294 (9th Cir. 1998). *Accord Roby v. Corp. of Lloyd's,* 996 F.2d 1353, 1363 (2d Cir.1993) (listing the same three situations but adding a fourth: if the fundamental unfairness of the chosen law

will deprive the plaintiff of a remedy). Here, Splendid is not arguing that any of these situations is present. Rather, it is arguing that, under the U.C.C., the Choice of Law Clause never became a part of the bunker contract and that, even if it did, Splendid, as a non-party, is not bound by it.

**13.** The law of the chosen jurisdiction governs the scope of a valid choice-of-law clause. *See, e.g., Milanovich v. Costa Crociere, S.p.A.,* 954 F.2d 763, 767 (D.C.Cir.1992) (explaining that if a "choice-of-law provision is valid, we will use the law that it selects to evaluate the enforceability of the remainder of the contract terms"); *Siegelman v. Cunard White Star,* 221

The bunker contract was a maritime contract for the sale of goods. "In maritime commercial transactions, the Uniform Commercial Code [UCC] is taken as indicative of the federal common law of admiralty." *Interpool Ltd. v. Char Yigh Marine (Panama) S.A.*, 890 F.2d 1453, 1459 (9th Cir.1989), *amended*, 918 F.2d 1476 (9th Cir.1990). Thus, the Court must look to the UCC to determine the validity of the Choice of Law Clause.

The Bunker Confirmation provided: "This confirmation incorporates the seller's standard terms and conditions dated 3 January 2000. Pls inform us if you require a copy.... Pls advise this office immediately of any errors, omissions, or changes involving any of the items above." Paragraph 17 of the Terms and Conditions (i.e., the Choice of Law Clause) provided: "Each Transaction shall be governed by the laws of the United States and the State of Florida...."

Trans–Tec asserts that, as a result of the Bunker Confirmation, the Choice of Law Clause became a valid part of the bunker contract. Defendants maintain that the Choice of Law Clause did not become part of the bunker contract because the Bunker Confirmation amounted to an acceptance or confirmation which contained additional terms which materially altered Kien Hung's offer. Therefore, Defendants contend that the Terms and Conditions, including the Choice of Law Clause, did not become part of the contract.

UCC § 2–207 determines whether additional terms in a confirmation or acceptance become part of the contract. Thus, the Court will look to UCC § 2–207 to determine whether the Choice of Law Clause became part of the bunker contract. UCC § 2–207 provides:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

 (a) the offer expressly limits acceptance to the terms of the offer;

 (b) they materially alter it; or

 (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

U.C.C. § 2–207(1)–(2). The applicable California and Florida provisions are identical to their UCC counterpart. *See* Cal. Com.Code § 2207; Fla. Stat. Ann. § 672.207.

As noted above, there is no dispute here as to formation; Splendid acknowledges that a contract was formed.[14] Nor is there any dispute that Trans–Tec and Kien

F.2d 189, 193 (2d Cir.1955) (finding choice-of-law provision selecting English law enforceable, and the using English law to interpret a provision limited the time for suit); *Jansson v. Swedish Am. Line*, 185 F.2d 212, 218 (1st Cir.1950) (noting that "when the parties contract with the law of some particular jurisdiction in view, the law of that jurisdiction will be applicable in determining the interpretation and validity of the contract.").

14. The parties agree on the chronology. On February 17, 2003, a manager with Kien

Hung faxed the Bunker Inquiry to Huang. The Bunker Inquiry requested a quote for bunkers to be provided to the Vessel for bunkering at Busan, Korea on February 24, 2003. Huang then faxed the Inquiry to Quek. Quek provided Huang with a bunker quote, which Huang then communicated to Kien Hung. In response, Kien Hung faxed Huang the Bunker Order. Huang then faxed the Bunker Order to Quek, who in turn sent an email to Huang containing the Bunker Confirmation. Huang

Hung are merchants. The only question is whether the Choice of Law Clause became part of the bunker contract. As the California Supreme Court has noted, "subsections (a), (b), and (c) of section 2207, subdivision (2), operate in the alternative. If any one of the three subsections applies, the variant terms of an acceptance do not become part of the agreement." *Steiner v. Mobil Oil Corp.*, 20 Cal.3d 90, 102, 141 Cal.Rptr. 157, 569 P.2d 751 (1977); *accord Gen. Tool Indus., Inc. v. Premier Machinery, Inc.*, 790 So.2d 449, 452 (Fla.Dist.Ct. App.2001) (explaining that under § 672.207(2) additional terms become part of the contract unless the offer expressly limited acceptance to the terms of the offer, the acceptance materially altered the terms of the offer, or a party to the contract objects); *Advanced Mobilehome Sys. of Tampa, Inc. v. Alumax Fabricated Products, Inc.*, 666 So.2d 166, 169 (Fla. Dist.Ct.App.1995) ("Between merchants, such additional terms become part of the contract unless they fall within the three stated exceptions."). Thus, since Splendid does not claim that Kien Hung expressly limited Trans–Tec's acceptance to the terms of its offer or notified Trans–Tec of its objection to the Terms and Conditions within a reasonable time after notice was received, the Terms and Conditions became part of the contract unless they materially altered it.

■ Under the UCC, an additional term is a material alteration "if it would 'result in surprise or hardship is incorporated without express awareness or hardship by the other party.'" *Steiner*, 20 Cal.3d at 102, 141 Cal.Rptr. 157, 569 P.2d 751 (quoting U.C.C. § 2–207 cmt. 4); *accord Advanced Mobilehome*, 666 So.2d at 169 ("The Uniform Code Comment to section 627.207(2) notes that additional terms which materially alter a contract are those that would result in surprise or hardship if incorporated without express awareness by the other party."). Examples of clauses which would normally materially alter a contract are: "'a clause negating such standard warranties as that of merchantability or fitness for a particular purpose in circumstances in which either warranty normally attaches ... [or] a clause requiring that complaints be made in a time materially shorter than customary or reasonable.'" *Therma–Coustics Mfg., Inc. v. Borden, Inc.*, 167 Cal.App.3d 282, 295–96, 213 Cal.Rptr. 611 (1985) (quoting U.C.C. § 2–207 cmt. 4.) Examples of clauses which "'involve no unreasonable surprise and which would therefore are to be incorporated in the contract unless notice of objection is seasonably given are: ... a clause fixing a reasonable time for complaints within customary limits.'" *Therma–Coustics*, 167 Cal.App.3d at 296, 213 Cal.Rptr. 611 (quoting U.C.C. § 2–207 cmt. 5.).[15]

then faxed a copy of the Bunker Confirmation to Kien Hung.

**15.** Authorities are split over whether materiality is a question of fact or law. *Compare Clifford–Jacobs Forging Co. v. Capital Eng'g & Mfg. Co.*, 107 Ill.App.3d 29, 33, 62 Ill.Dec. 785, 437 N.E.2d 22 (1982) ("[W]e believe that defendant's provisions on prices warrant a conclusion, as a matter of law, that no unreasonable surprise occurred.") *with TRWL Fin. Establishment v. Select Int'l, Inc.*, 527 N.W.2d 573, 579 (Minn.Ct.App.1995) ("Whether an additional term materially alters an agreement is a question of fact which must be

resolved on a case by case basis."). One leading treatise notes that "the question is generally regarded as one of fact, but a number of courts have now held or intimated that certain clauses (principally those restricting rights or remedies, such as arbitration or disclaimer clauses, or those shifting risks, such as indemnity provisions) by their very nature materially alter a contract, as a matter of law." 2 Samuel Williston & Richard A. Lord, *Williston on Contracts* § 6:22 (4th ed.1990). *See also Dale R. Horning Co. v. Falconer Glass Indus., Inc.*, 710 F.Supp. 693, 699 n. 6 (S.D.Ind.1989) ("[E]ven though many cases state that the question of material alteration is

While few courts have reached the question of whether a choice-of-law clause constitutes a material alteration of the terms of a contract, the few which have largely have held that a choice-of law clause *is* a material alteration. *See, e.g., Dassault Falcon Jet Corp. v. Oberflex, Inc.,* 909 F.Supp. 345 (M.D.N.C.1995) (finding that mutually exclusive choice of law clauses constituted material alterations to the contract); *Galaxy Int'l v. White Stores, Inc.,* 88 F.R.D. 311, 321 (W.D.Pa.1980) (holding that a choice of law clause was a material alteration where choice of law was never discussed by the parties); *Davidson Extruded Prods., Inc. v. Babcock Wire Equip., Ltd.,* 138 Misc.2d 118, 523 N.Y.S.2d 338, 341 (N.Y.Sup.Ct.1987) (finding that a choice of law clause which provided that the contract was to be governed by the law of the seller's country was a material alteration); *but see Coastal Industries, Inc. v. Automatic Steam Products Corp.,* 654 F.2d 375 (5th Cir.1981) (holding that a choice of law clause did not materially alter the terms of the contract because, as only two states had a significant relationship to the transaction, the parties must have realized that the law of one of those states would have controlled).

Likewise, courts have generally found forum-selection clauses to be material alterations. *See, e.g., M.K.C. Equip. Co. v. M.A.I.L. Code, Inc.,* 843 F.Supp. 679, 686 (D.Kan.1994); *Product Components, Inc. v. Regency Door & Hardware, Inc.,* 568 F.Supp. 651, 655 (S.D.Ind.1983); *Gen. Instrument Corp. v. Tie Mfg., Inc.,* 517 F.Supp. 1231, 1235 (S.D.N.Y.1981). In *Product Components,* the court justified its conclusion on the ground that the "selection of a distant forum with which a party has no contacts, while enforceable if contained in an agreement freely and con-

---

a question of fact, there are instances in which the question is treated as one of law."); 1 E. Allen Farnsworth, *Farnsworth on Contracts* § 3.21, at 324–25 (3d ed. 2004) ("A vast amount of litigation has been devoted to determining whether particular terms result in such 'surprise or hardship' as to materially alter the contract or whether they do not, a question that courts have often treated as one of fact but sometimes as one of law."). In general, courts appear to favor the view that materiality is a question of fact. *See, e.g., Waukesha Foundry, Inc. v. Indus. Eng'g Inc.,* 91 F.3d 1002, 1008 (7th Cir.1996) ("[T]he thrust of our prior decisions analyzing the materiality of additional terms counsels against an across-the-board categorical approach to the materiality question. Instead, we have viewed the question of materiality as invoking an inquiry into the circumstances of the parties' relationship, expectations, and course of dealing. As with so many other aspects of contract law, the question of materiality is marked by relativity."); *N & D Fashions, Inc. v. DHJ Indus., Inc.,* 548 F.2d 722, 726 (8th Cir.1977) ("[T]he better reasoned position is that the question whether an additional term constitutes a 'material alteration' is a question of fact to be resolved by the circumstances of each particular case."); *but*

see *Mead Corp. v. McNally–Pittsburg Mfg. Corp.,* 654 F.2d 1197, 1206 (6th Cir.1981) ("Absent the [UCC], questions of contract formation and intent remain factual issues to be resolved by the trier of fact after careful review of the evidence. However, the [UCC] provides rules of law, and section 2–207 establishes important legal principles to be employed to resolve complex contract disputes arising from the exchange of business forms. Section 2–207 was intended to provide some degree of certainty in this otherwise ambiguous area of law. In our view, it is unreasonable and contrary to the policy of the [UCC] merely to turn the issue over to the uninformed speculation of the jury left to apply its own particular sense of equity."). However, California and Florida appear to treat materiality as a question of law where the facts are undisputed. *See Frank M. Booth, Inc. v. Reynolds Metals Co.,* 754 F.Supp. 1441, 1446 (E.D.Cal.1991) ("[T]he California courts treat application of § 2207 to undisputed facts as a matter of law."); *Gen. Tool Indus., Inc. v. Premier Mach., Inc.,* 790 So.2d 449, 451–52 (Fla.Dist.Ct.App.2001) (holding that resolution of a dispute over additional terms in a confirmation or acceptance may properly be resolved on summary judgment).

sciously entered into, can result in surprise and hardship if permitted to become effective by way of confirmation forms that unfortunately are all too often never read." *Product Components*, 568 F.Supp. at 655.

Since it is indisputable that "[c]hoice of law is of far greater strategic important to the parties [to a contract] than a choice of forum, which in great respect is simply a matter of convenience," *Marine Oil Trading Ltd. v. Motor Tanker PAROS*, 287 F.Supp.2d 638 645 (E.D.Va.2003), the cases involving forum-selection clauses are instructive. Indeed, the rationale offered by the court in *Product Components*—namely, that selection of a distant forum with which a party has no contacts can result in surprise and hardship—is even more true with respect to selection of the applicable law since differences in the applicable law can have consequences far more dire than additional travel costs.

■ Nor does *Coastal Industries* compel a contrary conclusion. Although *Coastal Industries* would constitute strong persuasive authority in some circumstances, it can readily be distinguished from the instant case. Unlike *Coastal Industries*, which involved a transaction having significant contacts to

only two jurisdictions, the bunker contract had significant contacts to a number of different jurisdictions: (1) the Vessel is Malaysian; (2) Kien Hung, the charterer, is a Taiwanese company; (3) Trans–Tec, the bunkerer, is a Singapore company; (4) the Bunker Inquiry was faxed by a manager in Kien Hung's Taiwan office to a person in Taiwan; and (5) the bunkers were scheduled for bunkering in South Korea. Under the circumstances, Kien Hung could hardly have known that either Malaysian or United States law would apply. Thus, *Coastal Fuels* is not apposite. Indeed, the factor considered determinative by the *Coastal Fuels* court—namely, whether the parties could have anticipated that the law designated by the choice-of-law provision would have applied even in the absence of the choice-of-law provision—weighs in favor of a finding of materiality here since it is exceedingly unlikely that United States law would apply absent the Choice of Law Clause.

The only factor cited by Trans–Tec that would, if true, weigh in favor of a finding of non-materiality (or, if the issue is framed as one of fact, raise a triable issue of fact regarding materiality) is Trans–Tec's claim that Kien Hung had been put on notice of Trans–Tec's Terms and Conditions by virtue of its prior course of dealing with Trans–Tec and WFS.[16]

**16.** In his declaration, Johannes Heijmen, WFS's Vice President for Credit & Risk Management, states that Kien Hung has been a Trans–Tec customer since at least 1993 and that Kien Hung was provided with copies of the Terms and Conditions on various occasions throughout this time. (Heijmen Decl. ¶¶ 7, 11.) He further claims that WFS provided bunkers to Kien Hung vessels hundreds of times between 2000 and 2003, including 17 times to the Vessel. (Heijmen Decl. ¶ 15, Ex. H.) While he claims that each of these provisions to Kien Hung vessels was subject to the Terms and Conditions, this is an impermissible legal conclusion. (Heijmen Decl. ¶ 15.) In fact, Heijmen testifies to only one instance in which he provided Kien Hung with a copy of the Terms and Conditions. Heijmen claims that he sent an email regarding the

Guarantee to W.K. Shih and Louis Chen on July 12, 2002 in which he attached, among other things, a copy of the Guarantee and the Terms and Conditions. (Heijmen Decl. ¶ 9, Ex. E.) Assuming that the email is admissible, it establishes only that the Terms and Conditions were provided to Kien Hung on one prior occasion. The only other affiant who states that she provided Kien Hung with a copy of the Terms and Conditions is Huang. Huang states that she sent Kien Hung a copy of the Terms and Conditions sometime in 2000. (Huang Decl. ¶ 5.) Huang, however, does not state whether the Terms and Conditions were sent in relation to a specific transaction. She simply says that she sent a copy of the Terms and Conditions sometime in 2000. Thus, the two affidavits establish, at most, only that the Terms and Conditions

To be sure, some courts have considered evidence of a prior course of dealing, as reflected in the repeated sending of a standard form containing the same term or condition, in determining whether an additional term constituted a material alteration. *See, e.g., Schulze & Burch Biscuit Co. v. Tree Top,* 831 F.2d 709, 716 (7th Cir.1987) (holding that an arbitration clause was not a material alteration where the seller's agent had sent a confirmation form containing the same arbitration clause "in each of the previous nine transactions ... between the two parties"); *Dixie Alum. Prods. v. Mitsubishi Int'l Corp.,* 785 F.Supp. 157, 160 (N.D.Ga.1992) ("Where, as here, there are repeated opportunities for performance by either party and repeated opportunities for objection, and where no objection is made, that course of dealing is relevant to the meaning and terms of the written agreement, and bears on the issue of 'unfair surprise.' Dixie's repeated failure, over sixteen prior transactions, to object to the arbitration provision (or even to read it) does not indicate unfair surprise and therefore is not 'material.'"). However, these deci-

sions have been widely criticized and do not represent the weight of authority. In *Trans–Aire Int'l v. N. Adhesive Co.,* 882 F.2d 1254, 1261 (7th Cir.1989), for instance, the Seventh Circuit limited *Schulze* by holding that, since an additional term will be considered material if it causes *either* unfair surprise *or* hardship, prior notice will not render an additional term non-material if it causes hardship. In *Step–Saver Data Systems, Inc. v. Wyse Technology,* 939 F.2d 91, 104 (3d Cir.1991), the Third Circuit went further, holding that "the repeated sending of a writing which contains certain standard terms, without any action with respect to the issues addressed by those terms, cannot constitute a course of dealing which would incorporate a term of the writing otherwise excluded under § 2–207." The court justified its holding on two grounds. First, the court noted that the repeated sending of a particular form shows only that the party sending the form *desires* certain terms. *Id.* Second, the court noted that since sellers in such situations have every opportunity to negotiate the precise terms they seek, their failure to do so

were provided to Kien Hung *in connection with an actual transaction* on only one prior occasion. Moreover, that transaction pertained to the Guarantee, which contained a forum-selection clause providing for a Singapore forum and a choice-of-law clause making Singapore law applicable.

Citing *Gospel Missions v. City of Los Angeles,* 328 F.3d 548 (9th Cir.2003) as precedent, Defendants argue that Trans–Tec's argument that the bunker contract was part of an ongoing course of dealing between Trans–Tec and Kien Hung should be barred as a judicial admission to the contrary. Defendants point to the fact that Trans–Tec did not characterize the bunker contract as part of an ongoing course of dealing in its Opening Brief on Dispositive Legal and Equitable Principles ("Opening Brief"). The Ninth Circuit has held that a court has the discretion to treat statements of fact contained in a brief as judicial admissions. *Am. Title Ins. Co. v. La-*

*celaw Corp.,* 861 F.2d 224, 227 (9th Cir. 1988). In *Gospel Missions,* the Ninth Circuit treated statements made in the plaintiffs' brief which asserted that all of the plaintiffs were in privity as binding judicial admissions. *Gospel Missions,* 328 F.3d at 557. In that case, however, the defendant relied upon the plaintiff's claim to its detriment while the plaintiff tried to benefit from its admission. *Id.* Here, there is no evidence that Trans–Tec has tried to benefit from its failure to describe the bunker contract as part of an ongoing course of dealing in its Opening Brief. Moreover, unlike the plaintiff in *Gospel Missions,* Trans–Tec did not make an affirmative representation of fact. Rather, it simply did not characterize the bunker contract as part of an ongoing course of dealing. Under the circumstances, Trans–Tec's failure to characterize the bunker contract as part of an ongoing course of dealing in its Opening Brief cannot be treated as a judicial admission.

strongly suggests that those terms are not part of the parties' commercial bargain. *Id.* Numerous courts have adopted the *Step–Saver* court's reasoning, although those courts have generally done so in the context of UCC § 2–207(3). *See, e.g., PCS Nitrogen Fertilizer, L.P. v. The Christy Refractories, L.L.C.,* 225 F.3d 974, 981 (8th Cir.2000) (finding that receipt of only one customer acknowledgment form prior to the transaction at issue in the instant litigation "hardly establishes a prior course of dealing sufficient to allow Christy to unilaterally include the arbitration provision in the contract"); *In re CFLC, Inc.,* 166 F.3d 1012, 1017 (9th Cir.1999) (finding in a case under Article 9 of the UCC that "[c]ourse of dealing analysis is not proper in an instance where the only action taken has been the repeated delivery of a particular form by one of the parties"), *Premix–Marbletite Mfg. Corp. v. SKW Chems., Inc.,* 145 F.Supp.2d 1348, 1356 (S.D.Fla. 2001) ("Terms and conditions contained in a form continually sent by one party do not constitute performance and cannot becoming [sic] binding as a course of dealing. The reason for this distinction between (a) the repeated manner of performance and (b) the repeated sending of a form is pragmatic. A party will certainly be cognizant of the manner in which the other side continually performs under an agreement, and if there is no objection to that performance by the first party, over a sufficient period of time, the first party is assumed to have acquiesced to the second party's manner of performance. The same cannot be said of forms continually sent from one party to another, which are often not read until a dispute arises."); *Transwestern Pipeline Co. v. Monsanto Co.,* 46 Cal.App.4th 502, 519, 53 Cal.Rptr.2d 887 (1996) ("[W]e conclude the conflicting terms and conditions on liability contained in the forms exchanged by the parties failed to establish a course of dealing and Monsanto's liability limiters did not become a part of the parties' contracts."). Although none of these cases involved UCC § 2–207(2), the rationales articulated by the *Step–Saver* court are equally compelling in the context of UCC § 2–207(2). Accordingly, the mere fact that Trans–Tec may have sent Kien Hung the Terms and Conditions on prior occasions does not constitute a course of dealing from which Kien Hung's consent to or lack of surprise at the Terms and Conditions can be inferred.

■■■ The Court, however, need not rest its rejection of Trans–Tec's course of dealing argument on this basis alone. That is because the evidence submitted by Trans–Tec establishes, at most, that the Terms and Conditions were provided to Trans–Tec in relation to *only one prior transaction* (i.e., the Guarantee).[17] Under well-established precedent, a single prior

17. It could be argued that the bunker contract was within the scope of the Guarantee and thus governed by it. Moreover, while Kien Hung was not a party to the Guarantee, it was a third-party beneficiary of the Guarantee, and under well-established precedent a third-party beneficiary can be bound to the terms of a forum-selection clause contained in the contract to which it is a beneficiary. *See, e.g., InterGen N.V. v. Grina,* 344 F.3d 134, 146 (1st Cir.2003) ("[A] third-party beneficiary of a contract containing an arbitration clause can be subject to that clause and compelled to arbitrate on the demand of the signatory."); *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,* 269 F.3d 187, 195 (3d Cir.2001) ("[W]hether seeking to avoid or compel arbitration, a third party beneficiary has been bound by contract terms where its claim arises out of the underlying contract to which it was an intended third-party beneficiary."); *Hugel v. Corp. of Lloyd's,* 999 F.2d 206, 209, 210 n. 7 (7th Cir.1993) (explaining that (1) a non-party to a contract may be bound to a forum-selection clause where the party is so "closely related" to the dispute that it would be "foreseeable" that it will be bound and (2) a third-party beneficiary, by definition, satisfies these requirements); *TAAG Linhas Aereas de Angola v. Transamerica Airlines, Inc.,* 915 F.2d 1351, 1354 (9th Cir.1990) (enforcing a forum-selection clause against a defendant who was not a

transaction cannot constitute a course of dealing within the meaning of the UCC. *See, e.g., Kern Oil & Ref. Co. v. Tenneco Oil Co.,* 792 F.2d 1380, 1385 (9th Cir.1986); *Int'l Therapeutics, Inc. v. McGraw–Edison Co.,* 721 F.2d 488, 491 (5th Cir.1983); *Campbell Farms v. Wald,* 578 N.W.2d 96, 100 n. 2 (N.D.1998); *Remco Equip. Sales*

*v. Manz,* 952 S.W.2d 437, 439 (Tenn.Ct. App.1997); *Rotuba Extruders v. Ceppos,* 46 N.Y.2d 223, 413 N.Y.S.2d 141, 385 N.E.2d 1068, 1072 (1978).[18] Thus, Trans–Tec's course of dealing evidence, even if admissible, fails to raise a triable issue of fact regarding Kien Hung's surprise or lack thereof.[19] Accordingly, the Court finds

party to the contract because none of the other non-party defendants objected to the forum-selection clause); *Manetti–Farrow, Inc. v. Gucci Am., Inc.,* 858 F.2d 509, 514 n. 5 (9th Cir.1988) (holding a forum-selection clause applied to all defendants, even those who were not parties to the contract, because the conduct of the non-parties was so closely related to the contractual relationship); *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.,* 709 F.2d 190, 203 (3d Cir.1983) ("[T]he law of contracts ... has long recognized that third-party beneficiary status does not permit avoidance of contractual provisions otherwise enforceable."); *Nelson v. CGU Ins. Co. of Canada,* 2003 WL 1856439, at *2 (D.Me. April 10, 2003) (rejecting argument that non-signatories to an insurance contract cannot be bound by the contract's forum-selection clause because "federal courts enforce forum-selection clauses equally against contract beneficiaries and signatories."); *Consol. Bathurst, Ltd. v. Rederiaktiebolaget Gustaf Erikson,* 645 F.Supp. 884, 887 (S.D.Fla.1986) (finding that a third-party beneficiary was bound by the choice-of-forum clause in the insurance contract it invoked); *Interpool Ltd. v. Through Transport Mut. Ins. Assoc. Ltd.,* 635 F.Supp. 1503, 1505 (S.D.Fla.1985) ("The law is clear that a third party beneficiary is bound by the terms and conditions of the contract it attempts to invoke. The beneficiary cannot accept the benefits and avoid the burdens or limitations of a contract.") (internal quotations omitted). However, in addition to a forum-selection clause, the Guarantee contained a choice-of-law clause making Singapore law applicable. Because it seeks to apply United States law, Trans–Tec has refrained from arguing that the bunker contract was governed by the terms of the Guarantee.

**18.** This is because the UCC defines a course of dealing as "as *a sequence* of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common

basis for understanding for interpreting their expressions and other conduct." U.C.C. § 1–303(b) (emphasis added); *accord* Cal. Com. Code § 1205(1); Fla. Stat. Ann. § 671.205. Courts applying the UCC's definition of "course of dealing" have emphasized the requirement that there be a "sequence" of previous transactions. For instance, in *Kern Oil & Ref. Co. v. Tenneco Oil Co.,* 792 F.2d 1380, 1385 (9th Cir.1986), the Ninth Circuit held that the "negotiation of a single prior contract" did not constitute a course of dealing. Numerous other courts have echoed this view. *See, e.g. Int'l Therapeutics, Inc. v. McGraw–Edison Co.,* 721 F.2d 488, 491 (5th Cir.1983); *Campbell Farms v. Wald,* 578 N.W.2d 96, 100 n. 2 (N.D.1998); *Remco Equip. Sales v. Manz,* 952 S.W.2d 437, 439 (Tenn.Ct.App.1997); *Rotuba Extruders v. Ceppos,* 46 N.Y.2d 223, 413 N.Y.S.2d 141, 385 N.E.2d 1068, 1072 (1978).

**19.** Defendants contend that Trans–Tec's evidence of prior course of dealing is foreclosed by the very Terms and Conditions Trans–Tec seeks to invoke. As noted above, the Terms and Conditions contain a Merger and Integration Clause. It provides:

> The Confirmation and General Terms shall together constitute a separate transaction ("Transaction"). These documents, taken together, shall constitute the full agreement. No other prior agreements or understandings, whether verbal or written, shall apply unless specifically reference in the Confirmation.

Based on this language, Defendants argue that the Court may not consider any evidence outside the Terms and Conditions if it finds that the Terms and Conditions became part of the contract. Under the UCC, however, a writing may be supplemented by evidence of course of dealing even if the writing is a complete integration. U.C.C. § 2–202. The applicable California and Florida statutory provisions are in accord. *See* Cal. Com.Code

that the Choice of Law Clause constituted an additional term which materially altered the bunker contract. Thus, the Choice of Law Clause did not become a part of the bunker contract.

### b. Are Defendants bound by the bunkering contract?

Even if the Choice of Law Clause applied, Trans–Tec would still need to establish that Splendid, a non-party to the bunker contract, was bound by the bunker contract. Trans–Tec attempts to accomplish this by means of a joint venture theory. It argues that Powick, the 40% shareholder in Splendid, was actually a shell corporation for Kien Hung and that Kien Hung operated Splendid as a joint venture with Halim Mazmin.[20] According

§ 2202; Fla. Stat. Ann. § 680.202. Thus, Defendants' claim that the Merger and Integration Clause would completely bar evidence of course of dealing is incorrect. Moreover, courts do not necessarily treat merger or integration clauses as conclusive of whether a writing was intended by the parties to encompass the entire agreement. Under Florida law, for instance, "[a]lthough merger or integration clauses have been considered strong evidence of finality, they are not conclusive on the issue of whether the writing encompasses the entire agreement of the parties." *Allapattah Servs., Inc. v. Exxon Corp.*, 61 F.Supp.2d 1308, 1315 (S.D.Fla.1999). In determining whether the writing constitutes the final expression of the parties, Florida courts consider multiple factors, including evidence of trade usage, course of dealing, and course of performance. *Id.* Of these factors, course of dealing is the most important. *Id. Accord Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859 (9th Cir.1995) (applying California law); *L.S. Heath & Son v. AT & T Info. Sys., Inc.*, 9 F.3d 561, 569 (7th Cir.1993) ("To be sure, the presence of a merger clause is strong evidence that the parties intended the writing to be the complete and exclusive agreement between them, but no such clause is dispositive. In order to determine whether the parties intended a writing to be the complete and exclusive agreement between them, a court must compare the writing with the prior negotiations."); *Sierra Diesel Injection Serv., Inc. v. Burroughs Corp. Inc.*, 890 F.2d 108, 112 (9th Cir.1989) (finding that "the presence of a merger clause while often taken as a strong sign of the parties' intent is not conclusive in all cases"); *Randle v. Glendale Nissan, Inc.*, 2005 WL 281229, at *4 (N.D.Ill. Feb.2, 2005) ("The UCC rejects the presumption that a written contract sets forth the parties' entire agreement. Rather, to determine the intent of the parties as to integration, the court will look to a variety of factors including merger or integration clauses, disclaimer clauses, prior negotiations, any alleged extrinsic terms, and the sophisticated of the parties.") (internal quotations and citations omitted).

**20.** The only evidence Trans–Tec cites in support of its theory are news articles and press releases in which the chief executive of Halim Mazmin referred to its partnership with Kien Hung. However, Trans–Tec did not submit these news articles and press releases in conjunction with its motion for summary judgment or its opposition to Defendants' motion. Rather, it attempts to rely on the fact that it submitted copies of them in conjunction with its Opening Brief on Dispositive Legal and Equitable Principles and its Response on Dispositive Legal and Equitable Principles. This is improper. While the Ninth Circuit has held that a verified complaint may be treated as an affidavit to the extent that the complaint is based on personal knowledge and sets forth facts admissible in evidence and to which the affiant is competent to testify, *Lew v. Kona Hospital*, 754 F.2d 1420, 1423 (9th Cir.1985), the press releases and news articles upon which Trans–Tec relies were not included in the complaint but as part of its Opening Brief and Response. Moreover, Trans–Tec did not lay a foundation for the admission of these documents at the time. Rather, it simply attached them as exhibits to its Opening Brief. As it is, their admissibility is highly questionable. While newspaper articles are self-authenticating under Fed.R.Evid. 902(6), press releases are not necessarily so, although at least one court has included press releases within the matter covered by Fed.R.Evid. 902(6). *See Arachnid, Inc. v. Valley Recreation Prods., Inc.*, 2001 WL 1664052, at *4 (N.D.Ill.Dec.27, 2001). Since the news articles and press releases are being offered for their truth, however, they must fall within a hearsay exception, which they do not appear to. Moreover, the "Offering Circular" attached as Ex. A to Trans–Tec's Response does

to Trans–Tec, Splendid is therefore bound by the bunker contract because Kien Hung, in entering into the contract, acted not only as the Vessel's charterer but as its owner on behalf of Splendid. Alternatively, Trans–Tec argues that Splendid is bound by the bunker contract because the Terms and Conditions provide that the bunker sale was on the credit of the Vessel owners.[21] This argument, however, begs the question of whether Splendid can be bound by a contract to which it was not a party.[22]

In response, Defendants argue that (1) Trans–Tec's joint venture theory fails and (2) Trans–Tec, which drafted the confirma-

tion and the terms and conditions, cannot unilaterally bind a non-party to the contract.

### i. Joint Venture Theory

▮▮▮ "Federal courts sitting in admiralty generally apply federal common law when examining corporate identity." *Chan*, 123 F.3d at 1294. Although there appears to be no federal appellate case on point in which the elements of a joint venture under federal common law are spelled out [23], "different jurisdictions generally adopt the same criteria for the establishment of a joint venture." *United States v. USX Corp.*, 68 F.3d 811, 826 n. 30 (3d Cir.1995). Accordingly, since the par-

---

not appear to be admissible. While the Circular appears to be a document sent by Halim Mazmin to its shareholders, it does not appear to be the type of document that is self-authenticating under Fed.R.Evid. 902(6) nor is there an affidavit authenticating it.

**21.** In fact, the Credit and Security Clause provides that "[p]roducts supplied in each Transaction are sold and effect on the credit of the receiving vessel...." (Ashby Decl. ¶ 8, Ex. C, ¶ 8.)

**22.** Of course, since the Credit and Security Clause was part of the Terms and Conditions, the Court would need to determine whether the Credit and Security Clause materially altered the contract.

**23.** In *Davidson v. Enstar Corp.*, 848 F.2d 574, 577 (5th Cir.1988), the Fifth Circuit held that the elements of a joint venture for purposes of the Longshore & Harbor Workers' Compensation Act ("LHWCA") were:

(1) whether the parties intended to form a partnership or joint venture; (2) whether the parties share a common interest in the subject matter of the venture; (3) whether the parties share profits and losses from the venture; and (4) whether the parties have joint control or the right of control over the venture.

However, the court identified these elements only after having first concluded that the law of joint ventures as it existed in 1927, when the LHWCA was enacted, applied. *Id.*

In *United States v. USX Corp.*, 68 F.3d 811, 826–27 (3d Cir.1995), the Third Circuit, applying New Jersey law, identified the following five elements as essential to the existence of a joint venture: (1) an agreement, express or implied, between the parties; (2) the contribution by each party of money, property, effort, knowledge or some other asset to a common undertaking; (3) the existence of a joint property interest in the subject matter of the venture; (4) the right of mutual control or management of the venture; and (5) an agreement to share the profits or losses of the venture.

In *Shell Oil Co. v. Prestidge*, 249 F.2d 413, 415–16 (9th Cir.1957), the Ninth Circuit, applying common law principles, identified the following factors as essential to the existence of a joint venture: (1) a contract between the parties, (2) a common purpose, (3) a community of interest, (4) mutual control, (5) contribution by the parties of property, money, efforts, skill or knowledge to the common enterprise, and (6) agreement to share in the profits and losses.

Under the Restatement (Second) of Torts, four elements are essential to a joint venture: (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control.

Restatement (Second) of Torts § 491 cmt. c (1965).

ties appear to agree on the applicable test, the Court will apply the elements set forth by the Second Circuit: (1) a specific agreement to carry on an enterprise for profit; (2) an intent to be joint venturers; (3) mutual contributions of financing, skill, property, knowledge, or effort; (4) some degree of joint control over the venture; and (5) a provision for the sharing of both profits and losses. *Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*, 909 F.2d 698, 701 (2d Cir.1990) (applying New York law).[24]

 In this case, Trans–Tec has produced no evidence showing (1) mutual contributions of financing, skill, property, knowledge, or effort, (2) some degree of joint control over the venture, or (3) a provision for the sharing of profit and loss. Indeed, Trans–Tec's only evidence of a joint venture—the press releases and newspaper articles—goes solely to the remaining two elements: a specific agreement and an intent to be joint ventures. Thus, if the press releases and newspaper articles were excluded, Trans–Tec would have no evidence as to any of the elements. Even with the press releases and newspaper articles, however, Trans–Tec has failed to raise a triable issue of fact with regard to three of the elements necessary to establish a joint venture.

 Moreover, even if Trans–Tec had raised a triable issue of fact regarding the existence of a joint venture, a trial would still not necessarily be in Trans–Tec's future. To prevail on its joint venture theory, Trans–Tec must do more than simply prove the existence of a joint venture. Since "[a] corporation and a joint venture are mutually exclusive ways of doing business," *id.* at 702, Trans–Tec must persuade the Court to disregard Splendid's corporate form. Further, in order to establish that Powick was a shell corporation for Kien Hung, Trans–Tec must establish that Powick had no separate corporate existence from Kien Hung.[25] Finally, even if Trans–Tec were able to prove that Splendid was a joint venture between Halim Mazmin and Kien Hung and that Powick was a shell corporation for Kien Hung, it would still need to show that the bunker agreement was within the scope of the joint venture.

Trans–Tec, however, has not raised a triable issue of fact regarding either Splen-

**24.** In *Bay Casino, LLC v. M/V ROYAL EMPRESS*, 1998 WL 566772, at *2 (E.D.N.Y. Aug.21, 1998), the district court noted that the *Itel* court's requirement that the joint venturers share losses was in conflict with an earlier Second Circuit case, *Anderson v. National Producing Co.*, 253 F.2d 834 (2d Cir. 1958), which held that New York law did not require the sharing of losses in order to prove a joint venture.

**25.** The Ninth Circuit has held that admiralty courts may pierce the corporate veil in order to reach the "alter egos" of a corporate defendant. *Chan*, 123 F.3d at 1294. Generally, " 'corporate separateness is respected unless doing so would work injustice upon an innocent third party.' " *Id.* (quoting *Kilkenny v. Arco Marine Inc.*, 800 F.2d 853, 859 (9th Cir.1986)). However, federal common law allows veil piercing "where a corporation uses its alter ego to perpetrate a fraud or where it so dominates and disregards its alter ego's corporate form that the alter ego was actually carrying on the controlling corporation's business instead of its own." *Chan*, 123 F.3d at 1294. In *Chan*, the Ninth Circuit looked to Second Circuit for guidance on the law of veil piercing under federal common law. *Id.* (citing *Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir.1980)). As articulated by the Second Circuit, the test for veil piercing encompasses a number of factors, including (1) the absence of corporate formalities, (2) inadequate capitalization, and (3) personal use of corporate funds. *Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 53 (2d Cir.1984). The Ninth Circuit, however, has cautioned that "[c]ommon ownership alone is insufficient to support disregard of the corporate form." *Chan*, 123 F.3d at 1294.

did's status as a corporation or Powick's status as a separate entity from Kien Hung.[26] While Defendants have introduced evidence that Splendid was incorporated under the laws of Malaysia, Trans–Tec has introduced no evidence raising a triable issue of fact regarding the validity of Splendid's corporate status. Further, while Defendants have introduced evidence that Powick was incorporated under the laws of Singapore, that it paid up share capital of Singapore $49,817.842, and that it had its own board of directors, Trans–Tec has proffered no evidence of an absence of corporate formalities, undercapitalization, or personal use of corporate funds. Indeed, to the extent that Kien Hung was relying on a U.S. $5 million guarantee from Powick, the Guarantee gives rise to an inference that Kien Hung, not Powick, was undercapitalized. Finally, Heijmen states in his declaration that an audited annual report of Powick which was made available to Trans–Tec at the time the Guarantee was being negotiated revealed that Powick had total equity of Singapore $75,637,329 at the end of 2001. (Heijmen Decl. ¶ 8.) This hardly constitutes evidence of undercapitalization.

### ii. Binding a Non–Party to the Contract

As an alternative to its joint venture theory, Trans–Tec contends that Splendid was bound by the bunker contract by virtue of a clause in the Terms and Conditions which provided that the bunker sale was on the credit of the Vessel's owners. Defendants counter that Trans–Tec, which drafted the confirmation and the terms

and conditions, cannot bind a non-party to the contract.

Defendants cite five cases in support of its claim that it cannot be bound to the bunker contract. First, Defendants cite *Rainbow Line, Inc. v. M/V TEQUILA*, 480 F.2d 1024 (2d Cir.1973). In *TEQUILA*, the Second Circuit addressed the issue of which country's law to apply in determining the priority of various maritime liens. The case involved a breach of a charter party by the vessel's owner. *Id.* at 1025. The owner breached the charter party so that the ship could be sold to another company. *Id.* The new owner in turn defaulted on a loan secured by a mortgage on the vessel. *Id.* The issue on appeal was whether the charterer or the mortgagor had priority. *Id.* This question, in turn, depended on whether the charterer had a maritime lien for the breach of the charter party. *Id.* If it did, it would have had priority over the mortgagor since the lien attached before the mortgagor recorded the mortgage. *Id.* at 1025–26. The mortgagor contended that British law applied because it was the law of the flag at the time of the breach; the charterer claimed that United States law applied because that is what the charterer and the owner intended. *Id.* at 1026. The court, however, held that the intent of the parties to the charter party could not operate to the disadvantage of third parties. *Id.* Therefore, it rejected the charterer's argument that the intent of the parties to the charter party should control. *Id.*

---

**26.** The mere fact that Kien Hung and Splendid may have a director (Shih Shia Loon) in common does not suffice to impute Kien Hung's actions to Splendid. *See Haas v. 653 Leasing Co.*, 425 F.Supp. 1305, 1315 (D.C.Pa. 1977) ("The mere fact that Galloway or anyone else was an officer of both corporations does not aid plaintiff. It is quite common for persons engaged in business to serve as officers or directors of more than one corporation as well as to occupy positions as officers or directors of civic organizations and religious or other nonprofit institutions. It could hardly be argued that such interlocking directorates or officerships lead to responsibility on the part of one of the organizations for liability arising out of the activities of the other.").

Second, Defendants cite *Gulf Trading & Transportation Co. v. M/V TENTO,* 694 F.2d 1191 (9th Cir.1982). In *TENTO,* the Ninth Circuit also addressed the issue of which country's law to apply in regard to various maritime lines. The case involved a Norwegian vessel owned by I/S Norexim ("Norexim"). *Id.* at 1192. Norexim chartered the vessel to one company, which in turn subchartered the vessel to another company. *Id.* Norexim's charter with the first company provided that United States law would govern and that the charterer would be responsible for obtaining the vessel's fuel. *Id.* The subcharterer proceeded to refuel the vessel twice. *Id.* When neither the subcharterer nor Norexim paid for the fuel, the two fuel companies initiated an *in rem* action against the vessel. *Id.* Seeking to avoid the application of United States law, Norexim argued, relying on *TEQUILA,* that the choice-of-law clause in the charter party was irrelevant since the fuel companies were not parties to the contract. *Id.* at 1196 n. 8. The Ninth Circuit, however, distinguished *TEQUILA* on the ground that, while the charterer in *TEQUILA* was seeking to enforce a contract so as to disadvantage a non-party, Norexim was seeking to avoid enforcement of a contract *to which it was a party* so as to disadvantage a non-party. *Id.* In the process, the court described *TEQUILA* as "merely stating an obvious truism—non-parties cannot be bound by an agreement." *Id.*

Third, Defendants cite *Redcliffe Americas Ltd. v. M/V TYSON LYKES,* 806 F.Supp. 69, 71 (D.S.C.1992), *rev'd on other grounds,* 996 F.2d 47 (4th Cir.1993). In *TYSON LYKES,* the court addressed the issue of whether Redcliffe Americas Limited ("Redcliffe"), which leased refrigerated containers to a shipping company that transported containerized goods between locations in the United States and Europe, had maritime liens against the two vessels which the shipping company leased from their owner, First American Bulk Carrier Corporation ("FABC"). *Id.* at 70. The lease agreement between Redcliffe and the shipping company provided that New York law would apply. *Id.* at 70 n. 1. The court held that the choice-of-law clause was not binding upon FABC because FABC was not a party to the lease. *Id.* at 71. The court explained that "[a] choice of law clause . . . may not operate to the prejudice of a defendant who is not a party to the contract containing the choice of law clause." *Id.* (citing *TEQUILA,* 480 F.2d at 1026).[27]

Fourth, Defendants cite *Madredeus Shipping Co. Ltd. v. Century Bridge Chartering Co. Ltd.,* 2000 WL 1205336 (S.D.Fla. Feb.11, 2000). In *Madredeus,* the ship's owner time chartered the vessel to a company pursuant to a six-month contract. *Id.* at *1. The charterer subsequently entered into a bunker contract with a fuel seller. *Id.* A dispute over non-payment subsequently arose, and the fuel seller had the vessel arrested. *Id.* A choice-of-law clause in the bunker contract provided that Hong Kong (British) law would govern. *Id.* at *3. Although the shipowner invoked the choice-of-law clause in order to defeat seizure of the vessel, the court held that the owner's invocation of the clause did not bind it to the contract. *Id.* at *5. In addition, the court held that the mere fact that the bunker confirmation was addressed to "Master and/or Owners and/or Managing Owners and/or Charterers and/or Operators of M/V 'Thiseas' and/or Sky–Sailing Overseas Beijing" was insufficient to bind the owner in the absence of

---

**27.** On appeal, the Fourth Circuit did not address this aspect of the district court's holding.

any evidence, such as a signature or fax confirmation, that the shipowner received the contract and accepted its terms. *Id.* at *6.

Fifth, Defendants cite *Lion de Mer S.A. v. M/V LORETTA D,* 1998 WL 307077 (D.Md. April 3, 1998). In *LORETTA D,* the owner of a vessel flagged flying a Liberian flag entered into a time charter with a charterer. *Id.* at *1. The charter party contained a prohibition-on-liens clause and a provision making the charterer responsible for paying for fuel. *Id.* The charterer subsequently failed to make payments on fuel which it purchased. *Id.* at *1. As a result, the fuel seller had the vessel arrested. *Id.* The vessel owner filed a motion to quash the arrest warrant on the ground that the seller did not have a valid lien. *Id.* The parties disagreed about whether Greek or Liberian law applied. *Id.* at *2. Instead of resolving the choice of law issue, however, the court simply determined whether a lien existed under either country's laws. After finding that no lien existed under Greek law, the court turned to Liberian law to determine whether the seller was entitled to a lien under Liberian law. *Id.* at *3. The court found that under Liberian law the seller of necessaries is not entitled to a lien where the seller "knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of a charter party . . . the person ordering necessaries was without authority to bind the vessel therefor." *Id.* Applying this standard,[28] the court found that the seller did not have a lien against the shipowner because there was no evidence that the owner took responsibility for the bunkering contract or that the seller exercised reasonable diligence in ascertaining whether

the charterer had the authority to bind the owner.

In response, Trans–Tec cites two cases in support of its contention that Splendid can be bound to the bunker contract. First, Trans–Tec cites *Ryan–Walsh, Inc. v. M/V OCEAN TRADER,* 930 F.Supp. 210 (D.Md.1996). In *OCEAN TRADER,* the plaintiff, International Marine Fuels San Francisco, Inc. ("IMF–SF"), provided bunkers to the ANANGEL HAPPINESS, as the OCEAN TRADER was then known, in Jakarta, Indonesia on June 13, 1990 and in Singapore on June 27, 1990. *Id.* at 212. IMF–SF billed the time charterer, Meridian Shipping ("Meridian"). *Id.* Meridian subsequently filed for bankruptcy. *Id.* At the time the liens allegedly arose, the ANANGEL HAPPINESS was owned by Anangel Happiness Companania Naveria, S.A. *Id.* The ship was subsequently bought by Lutecia Navigation Co., Ltd., and renamed SEA CREST. *Id.* Later still, the ship was sold to Sea–Shore Shipping Co., Ltd., and renamed the OCEAN TRADER. *Id.* at 212–13. The owner at the time the suit was filed was Waterville Navigation, Inc. ("Waterville"). *Id.* at 213. Although Waterville argued that Indonesia or Singapore law should apply, the court held that American law applied by virtue of a choice-of-law clause in the bunker invoice making American law applicable. *Id.* at 218–19.

Second, Trans–Tec cites *Liverpool & London Steamship Prot. & Indem. Ass'n v. M/V QUEEN OF LEMAN,* 296 F.3d 350 (5th Cir.2002). In *QUEEN OF LEMAN,* the Liverpool and London Steamship Protection and Indemnity Association ("L & L") provided protection and indemnity ("P & I") insurance to the owners and operators of the QUEEN OF LEMAN. *Id.* at 351. Under the terms of the P & I

---

**28.** The court noted Liberian law applied "principles identical to those employed in U.S. maritime law prior to the 1971 deletion of the duty of inquiry provisions from the Liens on Vessels Act, 36 Stat. 604 Ch. 373 (June 23, 1910)." *Id.*

contract, L & L had certain rights to assert liens for the collection of unpaid premiums. *Id.* L & L subsequently had the QUEEN OF LEMAN seized and sold. *Id.* Two additional parties, Tokio Marine and Fire Insurance Co. Ltd. ("Tokio") and Fuji Vegetable Oil, Inc. ("Fuji"), sought to recover from the proceeds of the sale. *Id.* To prevent L & L from recovering, Tokio and Fuji argued that the P & I contract called for the application of English law, which did not give L & L a maritime lien. *Id.* Also at issue in *QUEEN OF LEMAN* was the legality of the seizure of another ship, the KAPPA UNITY. L & L had sold P & I insurance to the owners of KAPPA UNITY. *Id.* at 352. The owners subsequently became delinquent on their premiums. *Id.* In 2000, after the owners had become delinquent, they sold the KAPPA UNITY to Interforce Shipping Ltd. ("Interforce"). *Id.* Interforce claimed to have no knowledge of the debts. *Id.* In an attempt to recover on the unpaid premiums, L & L had the vessel seized. *Id.* On appeal, the Fifth Circuit held that, under the terms of the P & I contract, the issue of whether a maritime lien existed in the first place was governed by the law of the local jurisdiction in which the vessel was seized. *Id.* at 352–54. As a result, L & L had a valid maritime lien in both the QUEEN OF LEMAN and the KAPPA UNITY. Nevertheless, Interforce argued that, as a non-party, it was not bound by the P & I contract. *Id.* The Fifth Circuit rejected this argument, explaining that, as the maritime liens had attached prior to Interforce's purchase, the fact that Interforce was not a party to the P & I contract was irrelevant. *Id.* at 355.

■ Of these cases, the Court finds *TYSON LYKES* the most persuasive. Although *OCEAN TRADER* bears the closest factual resemblance to the instant case, the court in *OCEAN TRADER* provided

no rationale for its conclusion that Waterville, a company which did not even own the ship at the time of the bunker sale, should be bound by the choice-of-law clause. Accordingly, the Court does not accord it much weight. Nor does the Court find *QUEEN OF LEMAN* apposite. In that case, the choice of law was dictated by the terms of the contract, terms which bear no resemblance to the terms at issue here. Moreover, the fact that Interforce was a not a party to the P & I contract was irrelevant because the liens had attached *prior* to its purchase of the vessel. Likewise, the Court does not find *LORETTA D* persuasive for the simple reason that it involved the application of Liberian law. Thus, it sheds no light on the instant dispute. Furthermore, while *TEQUILA* and *TENTO* do articulate the general principal that non-parties cannot be bound to a contract[29], they are not on all fours with the instant case. In *TEQUILA*, the charterer was seeking to bind a mortgagor, not the shipowner, while in *TENTO* the shipowner was seeking to *avoid* the contract. In *TYSON LYKES*, by contrast, an entity which had leased equipment to a shipping company was seeking to bind the shipowner to the lease. This fact patterns bears a close resemblance to the instant case. Accordingly, the Court adopts the reasoning of the court in *TYSON LYKES* and finds that Splendid, as a non-party to the bunker contract, cannot be bound by its terms. Accordingly, even if the Choice of Law Clause had become a valid part of the bunker contract, it would not govern the choice of law here.

### 2. General Maritime Choice of Law Principles

■ If there is no contractual choice of law, the choice of law will be determined by general maritime choice-of law

---

**29.** *TENTO* does so in dicta.

principles. *See Chan,* 123 F.3d at 1297 (holding that "federal courts sitting in admiralty apply federal maritime choice-of-law principles derived from the Supreme Court's decision in *Lauritzen* ... and its progeny"). In *Lauritzen v. Larsen,* 345 U.S. 571, 583, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), the Supreme Court identified seven factors to be considered in determining the choice of law: (a) the allegiance of the Trans–Tec, (b) the allegiance of the defendant shipowner, (c) the place of the contract, (d) the law of the flag, (e) the locality, (f) the inaccessibility of a foreign forum, and (g) the law of the forum. Although *Lauritzen* involved a tort claim, the seven-factor approach has been expanded to "guide courts in the application of maritime law generally," and is therefore the appropriate test for the present case. *Romero v. Int'l Terminal Operating Co.,* 358 U.S. 354, 382, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). The Supreme Court has since clarified that this list of factors is not exhaustive, and there may be other factors to be considered. *See Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 309, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). At that time, the Court added an eighth factor to the *Lauritzen* analysis: (h) the shipowner's base of operations. *Id.* The Ninth Circuit has interpreted the *Rhoditis* expansion of the *Lauritzen* analysis to mean that courts must look at all points of contacts between the transaction and sovereign legal systems affected by it, rather than applying the seven factors mechanically. *See TENTO,* 694 F.2d at 1195.

The factors must be weighed based on the type of claim involved. *See, e.g., Phillips v. Amoco Trinidad Oil Co.,* 632 F.2d 82, 85 (9th Cir.1980) ("Courts have also indicated that particular factors will merit varying degrees of consideration from cases to case. Factors that have little significance in one factual setting may warrant greater weight in another."); *Loginter S.A. v. M/V NOBILITY,* 177 F.Supp.2d 411, 417 (D.Md.2001). In *Lauritzen,* the Supreme Court addressed a shipboard tort, not a maritime lien; therefore, not all of the *Lauritzen* factors would apply equally to a contracts or unjust enrichment claim. *Id.* In disputes concerning maritime liens, courts should "look to the *Lauritzen* factors for guidance, but focus more attention on the citizenship of the parties, the location of the contract performance, and whether the ship is American," which are the first four factors of the *Lauritzen* test. *Id.* Accordingly, these four factors are discussed first below.

*a. Allegiance of the Plaintiff: Singapore*

The allegiance of the Trans–Tec is determined by the Trans–Tec's place of incorporation. *See, e.g., Romero,* 358 U.S. at 383, 79 S.Ct. 468; *Forsythe Int'l Ltd. v. M/V RUTH VENTURE,* 633 F.Supp. 74, 76 (D.Or.1985). Trans–Tec is incorporated in Singapore, with its principal place of business in Singapore. Furthermore, it is owned by a Singapore company. Thus, this factor points to Singaporean law.[30]

In explaining this factor, the Supreme Court reasoned that "[e]ach nation has a legitimate interest that its nationals and permanent inhabitants be not maimed or disabled from self-support." *Lauritzen,* 345 U.S. at 586, 73 S.Ct. 921. This statement refers specifically to plaintiffs who suffer personal injuries, but it could be extended to economically damaged plaintiffs as well. Because Trans–Tec is a Singaporean business and undeservingly bore the loss of Kien Hung's bankruptcy, Sing-

---

**30.** The fact that Trans–Tec may be ultimately owned by a US-based company does not negate the fact that Trans–Tec is registered as Singapore "sole proprietorship" with its principal place of business in Singapore.

apore has an interest in seeing Trans–Tec's debt repaid.

However, Trans–Tec cites several United States contacts to show that this factor points to United States law. First, Trans–Tec argues that all sales to Kien Hung after May 2002 were authorized by WFS's main office in Miami, Florida.[31] Additionally, Trans–Tec notes that Kien Hung had previously wired several payments to Trans–Tec's Chicago bank.

These arguments are unpersuasive. While Trans–Tec's invoice required payment to a United States bank, the invoice also directed billing inquiries to the Singapore office. Moreover, the Singapore office took the order, confirmed the order via an email bearing Trans–Tec's name and Singapore address and directing Kien Hung to inform "this office" of "any errors, omissions, or changes," and sent Kien Hung an invoice on the Singapore office's letterhead. Therefore, regardless of whether money was deposited in the United States, the transaction itself was handled by Trans–Tec's Singapore office. The fact that the extension of credit to Kien Hung may have been approved in advance by WFS' main office in Miami, Florida does not alter the analysis. The key inquiry is the place of incorporation. Since Trans–Tec was incorporated in Singapore, this factor points to Singapore law.

### b. Allegiance of the Defendant: Malaysia

Similarly, the allegiance of the Defendant is determined by the defendant's place of incorporation. *See, e.g., Romero*, 358 U.S. at 383, 79 S.Ct. 468; *Forsythe*, 633 F.Supp. at 76. Defendant Splendid Shipping is a Malaysian corporation. This factor points to Malaysian law.

Courts have discounted this factor in contracts disputes where, as here, the shipowner's allegiance and the ship's registration (also called "the ship's flag") are of the same nationality. *See Loginter*, 177 F.Supp.2d at 418. In *Loginter*, the shipowner and the ship's flag were both Maltese. *Id.* at 418. The court determined that when the shipowner's allegiance and the ship's registration are of the same nationality, this factor should be given less weight. *Id.* Relying on a quote from *Lauritzen*, the court suggested that this factor was created to discourage American shipowners from registering their ships in foreign countries for the sole purpose of obtaining more favorable shipping laws. *Id.* (citing *Lauritzen*, 345 U.S. at 587, 73 S.Ct. 921). Accordingly, the court concluded that where the shipowner's allegiance was the same as the ship's flag, this factor should be given less weight because the evasive registration that the factor seeks to uncover would not be not present. In that case, however, the court also relied on the fact that the shipowner was not a defendant. *Loginter*, 177 F.Supp.2d at 418. Here, of course, the shipowner is a defendant. Thus, the allegiance of the shipowner *is* relevant in a way which it was not in *Loginter*. As a result, the Court will accord this factor no less weight here.

### c. Place of Contract: Singapore

The place of contract "often has significance" in determining the choice of law in contract disputes. *Lauritzen*, 345 U.S. at 588, 73 S.Ct. 921. Here, Defendants dispute that they were a party to the contract. Thus, they contend that this factor should not be given any weight. The Sec-

---

**31.** In his declaration, Heijmen states, "In particular, in February, 2003 Mr. Louis Chen and I agreed to the further extension of credit for the bunker supply of the M/V HARMONY CONTAINER, and I notified the Trans–Tec Singapore office (Trans–Tec Asia) that there could be a further provision of bunkers to the M/V Harmony container." (Heijmen Decl. ¶ 13.)

1039

ond Circuit has endorsed this view. In *Carbotrade S.p.A. v. Bureau Veritas,* 99 F.3d 86, 91 (2d Cir.1996), the Second Circuit declined to consider the place of contract because no direct contractual relationship existed between the plaintiff and the defendant. Although the relationship between the plaintiff (a charterer) and defendant (a classification company which had contracted with the ship's owner to survey the ship) in *Carbotrade* was arguably more attenuated than the relationship between Trans–Tec and Splendid, the Court has already found that Splendid was not a party to the bunker contract. Thus, the principle articulated in *Carbotrade* should arguably apply here. The Court, however, declines to fully adopt the principle articulated in *Carbotrade.* Although the lack of a direct contractual relationship between the plaintiff and the defendant should factor into the equation, the Court finds that completely disregarding the place of contract factor in such cases is unwarranted. Accordingly, the Court will not discount the place of contract factor, although it will accord it less weight here.

In this case, the place of contract factor weighs in favor of the application of Singapore law. When a contract is made over a long distance, the place of contract is typically regarded as the location of the seller's office. *See, e.g., TENTO,* 694 F.2d at 1196 (finding that the place of contract was New York where the buyer contacted the seller at its New York office); *RUTH VENTURE,* 633 F.Supp. at 75. Since Trans–Tec's Singapore office took the Bunker Order and sent the Bunker Confirmation and the Invoice, the place of contract would be Singapore.

### d. Law of the Flag: Malaysia

"Under international law, each state determines the conditions on which it grants its nationality to a merchant ship, thereby accepting responsibility for it and acquiring authority over it." *Lauritzen,* 345 U.S. at 584, 73 S.Ct. 921. This principle is embodied in the law of the flag factor, in which the ship's nationality, determined by the ship's papers and flag, indicates what law should be applied. *Id.* In *Lauritzen,* the Court described this factor as having "cardinal importance," *id.* at 585, 73 S.Ct. 921, and warned that the law of the flag "must prevail unless some heavy counterweight appears." *Id.* at 586, 73 S.Ct. 921. Noting the significance attached by the Court to the law of the flag, the Ninth Circuit has stated that the law of the flag "should be accorded great weight in the choice of law analysis." *Pereira v. Utah Transport, Inc.,* 764 F.2d 686, 689 (9th Cir.1985). In the instant case, the Vessel was registered in Malaysia; therefore, its flag is Malaysian. This factor points to Malaysian law.

### e. Locality: Indeterminable

The locality, or the place of the wrongful act, is "commonly applied to torts in municipal and international law." *Lauritzen,* 345 U.S. at 584, 73 S.Ct. 921. This factor is most relevant to cases involving torts occurring at port because the precise location of the tort can be identified. However, this factor "is of limited application to shipboard torts, because of the variety of legal authority" over which a ship may navigate during its journeys. *Id.* In such cases, the locality factor would impose a different law based solely on where the ship happened to be located at the time of the tort or contract performance. Courts have recognized that imposing on ships the duty of "shifting from one standard of compensation to another as the vessel passes the boundaries of territorial waters" is an "onerous" and "unduly speculative burden" that would be "disruptive of international commerce and without basis in the expressed policies of this country." *Romero,* 358 U.S. at 383, 79 S.Ct. 468. This factor is even less helpful in contract

suits, because the place of the wrongful act could be either the place of delivery or the allegiance of the plaintiff. *Forsythe,* 633 F.Supp. at 76. In the present case, this factor could point to Busan, South Korea, because the ship was located there when it needed to be refueled, or to Singapore, the allegiance of Trans–Tec, in which case this factor duplicates the "allegiance of plaintiff" factor. Because the locality is difficult to determine and adds little value to the analysis in a shipboard tort or contracts case, the Court will accord this factor no weight.

### f. Inaccessibility of a Foreign Forum; Not applicable

This factor is relevant where the plaintiff would be disadvantaged in terms of delay or expense by the application of foreign law in a United States forum. *Lauritzen,* 345 U.S. at 590, 73 S.Ct. 921. There appears to be no danger of disadvantage in the present case. Both Singaporean and Malaysian law address maritime liens, following English common law. William Tetley, *Maritime Liens and Claims* 1331, 1365 (2d ed.1998). The parties disagree as to how Singaporean and Malaysian law would govern an unjust enrichment claim, but neither party claims that foreign law could not be applied in the United States. Because neither Trans–Tec nor Defendants claim lack of a foreign forum, this factor does not appear to be a consideration.

### q. Law of the Forum: Irrelevant

In *Lauritzen,* the Supreme Court rejected the application of Untied State law simply because "an American forum ha[d] perfected its jurisdiction over the parties and defendant [did] more or less frequent and regular business within the forum state." *Lauritzen,* 345 U.S. at 590, 73 S.Ct. 921. According the Court, the very purpose of a conflicts-of-law doctrine is "to assure that a case will be treated in the same way under the appropriate law re-gardless of the fortuitous circumstances which often determine the forum." *Id.* The Court found this consideration particularly pressing in the context of maritime cases since "jurisdiction of maritime cases in all countries is so wide and the nature of its subject matter so far-flung. . . ." *Id.* Moreover, the Court noted that the fact that both parties do business in the United States "may fall quite short" of the connection needed to apply United States law to extraterritorial torts. *Id.* Indeed, the Court noted that it was a "denial of due process" for a state to "attempt[ ] to draw into control of its law otherwise foreign controversies, on slight connections, because it is a forum state." *Id.* at 590–91, 73 S.Ct. 921. In light of the Court's reasoning in Lauritzen, it therefore seems inappropriate to apply United States law simply because the parties filed suit and do business in the United States. Thus, the Court will accord this factor no weight.

### h. Shipowner's Base of Operations: Malaysia

Finally, the base of operations factor is relevant where the defendant's place of incorporation and its base of operations are different. Because this factor considers the base of operations of the defendant, in the instant case the Court should look to both the base of operations of Splendid and the Vessel, since both are named defendants. This factor was created in *Hellenic Lines v. Rhoditis,* where the vessel was owned by a Greek corporation, but the corporation itself was 95% owned by a United States domiciliary and the ship's income was derived entirely from cargo entering and exiting the United States. *Rhoditis,* 398 U.S. at 306, 90 S.Ct. 1731; *see also Mattes v. Nat'l Hellenic Am. Line, S.A.,* 427 F.Supp. 619 (S.D.N.Y. 1977) (holding that the ship had "sufficiently substantial contacts" with the United States to warrant the application of

United States law because the ship made numerous calls at United States ports, carried primarily American passengers, advertised extensively in the United States, employed a United States corporation to handle marketing and sales operations, and employed a United States corporation as its port and husbanding agent).

In the present case, it is undisputed that Splendid's base of operations is Malaysia.[32] Accordingly, this factor weighs in favor of the application of Malaysian law.

### i. Conclusion

■ Applying the *Lauritzen* factors, the Court finds that the application of Malaysian law would be appropriate. While two factors point to Malaysian law and two to Singapore law, one of the factors which points to Malaysian law (the law of the flag) has traditionally been accorded the most weight while the Court has already indicated that one of the factors which points to Singapore law (the place of contract) will be accorded less weight here. While the Court deems the question a close one, especially in light of the fact that Trans–Tec, the injured party, was based in Singapore, the Court finds that, on balance, the factors tip in favor of the application of Malaysian law.

## IV. CONCLUSION

Because the Choice of Law Clause did not become part of the bunker contract, and because Splendid, as a non-party, is not bound by the bunker contract, the Court hereby GRANTS the Motion for Partial Summary Judgment by Defendant M/V Harmony Container *in rem* and

Claimant Splendid Shipping SDN BHD [19] with respect to the question of whether the Choice of Law Clause determines the choice of law and hereby DENIES Trans–Tec's Cross–Motion for Partial Summary Judgment on Choice of Law [32] with respect to the question of whether the Choice of Law Clause determines the choice of law. Moreover, because the *Lauritzen* factors favor of the application of Malaysian law, the Court GRANTS the Motion for Partial Summary Judgment by Defendant M/V Harmony Container *in rem* and Claimant Splendid Shipping SDN BHD [19] with respect to the question of which country's law applies. Accordingly, the parties are ORDERED to file simultaneous motions for summary judgment based on the application of Malaysian law to this dispute *by no later than Monday, September 19, 2005.* Replies will be due one week later on *Monday, September 26, 2005.* A hearing will then be held at 1:30 p.m. on *Monday October 3, 2005.*

IT IS SO ORDERED.

---

**32.** Trans–Tec contends that the base of operations of the Vessel itself is the United States because it transported $48.0 million in goods to and from Long Beach from October 2002 to October 2003. However, Trans–Tec has never provided any foundation or authentication for the documents on which it bases this argument. Moreover, as Defendants point out, even if these documents were admissible, they establish only that a handful of the Vessel's cargo calls were at Long Beach and that none of those stops related to the transaction at issue. *Cf. Banegas v. United Brands Co.,* 663 F.Supp. 198, 205 (D.S.C.1986) ("The mere fact that the vessel made cargo calls in the United States does not change [the] base of operations . . . to the United States.").